## MARBLEHEAD LAND CO. et al. v. CITY OF LOS ANGELES.
### No. 6104.

Circuit Court of Appeals, Ninth Circuit.
Feb. 16, 1931.

RUDKIN, Circuit Judge, dissenting.

Oscar Lawler and James E. Degnan, both of Los Angeles, Cal., for appellant Standard Oil Co.

M. F. Mitchell and Marvin Osburn, both of Los Angeles, Cal., for appellant Marblehead Land Co.

Erwin P. Werner, City Atty., and Frederick Von Schrader, Asst. City Atty., both of Los Angeles, Cal., for appellee.

Before RUDKIN and WILBUR, Circuit Judges, and SAWTELLE, District Judge.

WILBUR, Circuit Judge.

Appellants filed a bill in equity to enjoin the appellee from enforcing a zoning ordinance by the terms of which the oil well drilling operations of the appellants were declared illegal in the zone wherein the land owned by the appellant Marblehead Land Company is located. This land is leased by the appellant Standard Oil Company of California under a lease which provides for the sinking of oil wells upon said property, and, if oil is found thereon, provides for the production of oil therefrom.

Appellants concede that, since the decision of the Supreme Court in Euclid v. Ambler Realty Co., 272 U. S. 365, 47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016, the appellee city has power to enact a zoning ordinance. The right of the city of Los Angeles so to do was recognized and upheld by the Supreme Court in Zahn v. Board of Public Works, 274 U. S. 325, 47 S. Ct. 594, 71 L. Ed. 1074. Appellants, however, contend that the situation as disclosed by the evidence shows that the attempted exercise of police power in the given instance is so unreasonable and arbitrary an exercise of that power that the ordinance should be declared void by the court as an infringement upon the constitutional rights of the appellants, in that their property is thus taken from them without due process of law. In support of their claim that the ordinance is unreasonable, appellants rely upon certain uncontroverted facts:

Appellants' land lies about seven miles distant from the heart of the city of Los Angeles, at Seventh and Broadway. Appellant Marblehead Land Company's property contains about 291 acres, and the Standard Oil Company lease covers approximately 396 acres, including the land of the Marblehead Land Company. This land has heretofore been used for farming operations, but it is now believed has possibilities as oil land. An oil derrick has been erected thereon for the purpose of determining and developing its possibilities as oil land. Several tracts of land in which the streets have been improved and upon which expensive residences have been and are being developed are in the vicinity of appellants' land. Three golf courses abut on the land. The nearest dwelling house on one of the tracts of land to the drilling rig erected upon appellants' land is 1,100 feet. Appellants' land for residence purposes is worth about $10,000 per acre. If oil is discovered thereon, the value of the oil produced therefrom, according to the opinion of experts based upon oil-producing lands upon the same or similar geological structures, would be many millions of dollars. The Standard Oil Company paid the Marblehead Land Company $65,000 in cash for said oil lease, and in addition thereto has made expenditures in connection with the proposed drilling operations aggregating in all $136,-000. The lease was obtained and the operations begun after the enactment of an ordinance which will hereinafter be referred to, excluding a portion of the appellants' lands from the residential district or zone. Upon the trial evidence was adduced as to the effect upon property in the neighborhood of the proposed drilling operations. This evidence consisted of photographs showing the condition of appellants' property and of the surrounding areas devoted to residence purposes, the character of buildings erected thereon, and the effect upon the value of the property subdivided for residence purposes, of the proposed drilling operations; and, in addition, certain evidence was offered to show the extent of the fire hazard resulting from such operations and the effect of releasing natural gases which was reasonably to be anticipated from successful drilling operations.

On the question of fire hazard, one of the appellants' witnesses, R. H. Morrison, testified as follows: " * * * That there is a slight fire hazard in putting down a test well, but such hazard results from lack of foresight and carelessness on the part of the driller and that fire can be prevented by keeping the hole full of rotary mud and weighting the mud by chemical compounds, such as barytes, which prevents the escape of gas and prevents the ignition by sparks resulting from friction of the rotary, and also exercising the precaution of moving the boiler back from the well when nearing completion of the hole to prevent the ignition of a small amount of gas which may escape; that there is practically no danger from ignition resulting from the use of electricity about a derrick; that

the Oil Company has had no fire around a derrick in the last two or three years."

The witness L. Z. Johnson, called by the appellee, testified: " * * * That danger of fire occurs in bringing in new wells, from fire under the boilers or high gas pressure in the well and friction of the rock running through the casing, causing sparks; that if the well should run wild, it would result in the destruction of the property, and that this does occur; that in drilling a given area of approximately five acres, one well to three acres would be sufficient; that considerable noise results from drilling test wells, and from the steam lowering and lifting tools; that it is customary to drill day and night, and that oil fumes result from such activities but that the fumes can be shut off by the operators if they are prepared for it; that dust results from the trucks running back and forth to the well, and that it is customary in drilling near dwellings to oil such roads and that oil considerably prevents the raising of dust."

The court made findings of fact upon the issues, and, with reference to the effect of drilling operations upon the surrounding property, found the facts to be as follows:

" * * * That the said property of plaintiffs is already partially surrounded by residential developments, including some very high class and expensive residences located within the tracts or subdivisions nearby which have been highly improved with streets, curbs, sidewalks, lights and other utilities; that neither plaintiffs' said property nor any of the immediately adjacent property is of an industrial character, nor devoted to such uses; that it is problematical whether or not there is any oil, gas or other hydrocarbon substances located beneath the surface of plaintiffs' property in commercially paying quantities; that no oil, gas or hydrocarbon wells have ever been developed, operated or maintained on plaintiffs' said property.

"That the operation or maintenance of oil wells on plaintiffs' said property or the drilling for or prospecting for oil on said property would cause the atmosphere in the said district surrounding plaintiffs' said property to become contaminated and polluted with obnoxious fumes and odors; that these obnoxious odors would cause serious discomfort, damage and inconvenience to the owners of the property surrounding plaintiffs' said property and would make living conditions on said properties less desirable and would cause the value of the said surrounding prop-

erty to greatly depreciate; that the maintenance or operation of oil wells on plaintiffs' said property or the drilling or prospecting for oil, gas or other hydrocarbons on said property would produce noises which would be obnoxious to persons owning property near to or surrounding plaintiffs' said property in that the said noises would make living conditions on such surrounding or nearby property to be much less desirable and would greatly reduce the value of the said surrounding property; that the drilling for oil, gas or other hydrocarbon substances on plaintiffs' said property or the maintenance of oil wells and the operation of the same on plaintiffs' said property would create a fire hazard which would be imminent at all times during the operation, maintenance or drilling of the said wells for the purpose of extracting oils, gas or other hydrocarbon substances, in that there would be great danger of such oil wells catching on fire during such drilling operation and that such imminent fire hazard would cause the property surrounding, nearby or adjacent to plaintiffs' said property to become less desirable for residential purposes and would greatly depreciate the value of the said surrounding or adjacent property; that the operation or maintenance of oil wells on the plaintiffs' said property or the drilling of said oil wells on plaintiffs' said property would constitute a nuisance and is not an enterprise or pursuit suitable to be carried on on the plaintiffs' said property. That the plaintiffs' said property and the property surrounding and adjacent thereto is rolling and contains attractive and beautiful inclines and declines which greatly add to the residential character of the plaintiffs' said property and the surrounding property, and cause the same to be extremely suitable and adaptable for residential purposes and landscaping in connection therewith; that the location of oil derricks and oil tanks in the center of such a district would cause the attractive appearance of the said property to be destroyed and would cause the whole of the surrounding territory to become unsightly and ugly in appearance; that it is impossible to drill for oil and to operate oil wells on plaintiffs' said property or to extract oils, gas or other hydrocarbon substances from plaintiffs' said property without using in connection therewith tall and unsightly oil derricks and without using in connection therewith power other than animal power; that the power necessary to be used in connection with all of these drilling operations or the maintenance of the wells for the purposes hereinabove set

forth would require apparatus for the generation of such power and that the amount of power to be generated by each of such apparatus for the drilling of any oil well or wells for the purpose of extracting gases, oil or hydrocarbon substances would be greater than five horsepower."

Appellants also introduced experts to sustain their contention that their land was oil-bearing land. The defendants introduced evidence of experts tending to show that it was not oil land, and in that connection showed that three oil wells had been drilled in that neighborhood to a depth of over 4,000 feet each without striking oil. The case, however, must be disposed of on the theory that appellants' land is oil-bearing land, and that the ordinance preventing the appellants from drilling operations thereon has in effect destroyed the value of said property as oil land.

Assuming for the moment that the facts are correctly determined by the trial court, the right of the appellee city to pass the ordinance in question need not be confined to the more recently developed phase of police power involved in zoning ordinances which undertake in a measure to direct the future growth of the city, but may also be predicated upon the power of the city to protect its inhabitants from fire hazard and from noxious gases; that is to say, the power exercised by the city authorities in enacting the ordinance may be based upon that branch of the police power which deals with the public safety. It cannot be doubted under the authorities that, if there is a menace to the health and property of its citizens from the proposed drilling operations, under the police power as long established and exercised the ordinance would be a valid exercise of such police power. See cases cited in Masonic Cemetery Ass'n v. Gamage (C. C. A.) 38 F.(2d) 950, 956.

The second branch of the police power upon which the ordinance in question may be based is that more recently developed phase of the police power which in the interests of the general welfare permits a city to so limit the class of structures which can be erected and the kind of business which can be maintained within various areas or zones as to regulate and control the future growth and development of the city. The zoning ordinance as such looks largely to the future development of the city rather than to a protection of a pre-existing status. With reference to the power of the city council of Los Angeles to enact a zoning ordinance, there

would seem to be little doubt that in the interests of such future growth of the city and in order to regulate that growth it is competent for city authorities to determine that vacant land may be included in a residence district, and, when so included, that structures other than those authorized by the ordinance cannot be erected thereon even though the owner so desires and the erection of such structures or the maintenance of a forbidden, but otherwise legal business therein, might be more profitable to the owner than the use of such property for residence purposes. This was established by the decision of the Supreme Court in Zahn v. Board of Public Works, supra, sustaining the decision of the Supreme Court of the state of California in 195 Cal. 497, 234 P. 388, citing Miller v. Board of Public Works, 195 Cal. 477, 234 P. 381, 38 A. L. R. 1479. It appears from the opinion in these cases and from the record that the land owned by the appellant and in the neighborhood thereof was vacant at the time of the enactment of the zoning ordinance which limited the class of buildings which could be erected thereon. It was claimed by the appellants in that case that their land adjoined Wilshire boulevard, "a main artery of travel through and beyond the city, and that if such property were available for business purposes its market value would be greatly enhanced. * * * The effect of the evidence is to show that the entire neighborhood at the time of the passage of the zoning ordinance was largely unimproved, but in the course of rapid development." As it was not questioned that appellants' land is suitable for residences and very valuable therefor, and that it is in the line of development of residential districts, it would seem clear that, under the general power of a city to regulate its growth, the appellee city would be entitled to restrict the use of appellants' property to such purposes as were permitted in the zone in which it had been included, unless under all the circumstances as disclosed by the evidence such result would be so unreasonable and arbitrary as to justify the interference of the court under well-established limitations upon the police power of the city. In view of the surroundings of the appellants' property, the fact that it is in the line of development of the residential district of Los Angeles, that expensive dwellings had already been erected in the neighborhood, that adjacent property has been improved by opening streets and paving and sidewalking the same, there would seem to be little doubt of the right of the city under zoning ordi-

nance to prevent the use of appellants' property for industrial and manufacturing plants or the erection of gas works which would be entirely out of harmony with the development of the neighborhood.

The situation disclosed by this record, however, does not deal primarily with the right to improve the appellants' property by the erection of buildings thereon, but rather with the right of the owner to produce from the soil the minerals therein contained. In this connection our attention is called to the decision of the Supreme Court in Pennsylvania Coal Co. v. Mahon, 260 U. S. 393, 43 S. Ct. 158, 159, 67 L. Ed. 322, 28 A. L. R. 1321, wherein a statute passed by the Legislature of the state of Pennsylvania was held invalid, as taking from the Pennsylvania Coal Company its right to mine coal which it had reserved in the deeds it had made to the surface, the grantees in the deed assuming the risk and waiving all claims of damages which might result from mining operations of the grantor. The state Legislature prohibited mining in such fashion as would interfere with the structures erected by the grantees upon the surface, thus in effect giving to the grantees a security in the enjoyment of the surface which they had not bargained nor paid for, and depriving a grantor of the right it had reserved in its deed to the grantee. It was held that this was so unreasonable an exercise of the police power that it was violative of the constitutional rights guaranteed to the Pennsylvania Coal Company and therefore void. In arriving at this conclusion, the Supreme Court called attention to the fact that the statute in question did not apply to land where the surface "is owned by the owner of the underlying coal and is distant more than one hundred and fifty feet from any improved property belonging to any other person." While this decision deals with the right of an owner to develop its inherent potentialities by producing therefrom its mineral wealth, there does not seem to be any distinction in principle between depriving an owner of the right to develop such inherent qualities of the land and a regulation which prohibits an owner from erecting upon his land structures which he believes will, and which in fact will, enhance the value of his property.

It is conceded in the case of Zahn v. Los Angeles, supra, that the appellants' property was worth more for business purposes than for residence purposes, and the taking of this difference in value was just as real as in the case where an owner is prohibited from developing the mineral resources of his land. In each case there is a definite loss of value which is prohibited by the Constitution as a taking of private property without compensation unless such taking is in the exercise of the police power. The fundamental question, then, in each case, is whether or not the owner has been deprived of property by legitimate exercise of the police power of the state in its effort to promote the general welfare of its citizens. If there is any difference between the taking of the unearned increment by zoning ordinances and the taking of the inherent value of the soil or its contents, it arises from the fact that it might be deemed unreasonable to prevent a man from developing natural gas upon his property and reasonable to prohibit the erection of gas works, because in the former case gas works can be erected in other suitable zones or districts in the city, while in the case of natural gas it must be reproduced from the land in which it exists. It might therefore be held that an ordinance is reasonable where it requires the establishment of gas works or oil refineries in a certain zone and prohibited in others, and might be unreasonable and therefore void because it prohibited an owner from producing natural gas from the land in which it was located. In either event, however, there can be no question of the inherent right of the city to control or prohibit such production, provided it is done reasonably and not arbitrarily. In that event the loss must fall upon the owner whether it prevents him from erecting structures or establishing industries which he desires to erect or establish, or whether it prevents him from developing the inherent potentialities of his land. Before proceeding with a further discussion, it may be well to distinguish between the functions of the legislative body in which is deposited the police power and that of the courts to which the citizen may appeal in the event his property is taken without compensation by an unwarranted exercise of the police power.

The legislative body intrusted with the police power has a wide discretion which cannot be interfered with by the courts. Their laws or ordinances enacted in pursuance of the police power are invested with a strong presumption of validity. If the question as to whether or not the legislation is unreasonable or arbitrary or an unequal exercise of power is fairly debatable, the legislation must be upheld as valid. Zahn v. Board of Public Works, 274 U. S. 325, 47 S. Ct. 594, 71 L. Ed. 1074, supra, and cases therein cited.

The question for our consideration then is whether or not the reasonableness of the ordinance in question is fairly debatable. First, we will consider the matter with reference to the question of fire hazard. On the one hand it might be concluded that there was no substantial danger to adjoining property from the production of gas and oil upon appellants' land. This, however, depends upon the uncertain question as to the amount of gas and the pressure which would be developed therefrom by penetrating the oil or gas strata. It is a matter of common knowledge that in some cases oil wells, particularly in new territory, have gotten beyond control and resulted in disastrous fire. Such a well in the heart of a great city would be an intolerable nuisance, and it is conceded it could be prohibited by the city council in the exercise of its police power. In an outlying and relatively unsettled district it is obvious that the fire hazard would be much less, if not entirely negligible. The city council presumptively acted upon the theory that such a hazard was real and substantial. The trial court, after hearing the evidence, held it to be a fact that the fire hazard was real and substantial. There is testimony to sustain this conclusion. The question then is whether this court, acting upon the evidence in the record to the contrary, and upon its general knowledge concerning production of oil, shall declare that the conclusions of the city council and of the trial judge are so arbitrary and unreasonable that they may be justly disregarded as determining the rights of the appellants. In this connection it should be observed that, in passing upon the conclusions of the trial court, or the local legislative body, the appellate court should give great weight to the determination of local authorities and the local courts especially familiar as they are with local conditions. Welch v. Swasey, 214 U. S. 91, 106, 29 S. Ct. 567, 53 L. Ed. 923; Laurel Hill Cemetery v. San Francisco, 216 U. S. 358, 365, 30 S. Ct. 301, 54 L. Ed. 515; Patsone v. Pennsylvania, 232 U. S. 138, 144, 34 S. Ct. 281, 58 L. Ed. 539.

From the foregoing it would appear that the very least that could be said in favor of the validity of the ordinance is that the question of fire hazard resulting from mining operations is debatable, the diffusion of noxious and offensive gases into the surrounding dwellings is established by uncontradicted testimony, the utility of the appellants' land for residence purposes is thoroughly established and conceded, the trend of the residence district of the city toward and about the land in question is undeniable, and therefore the court is precluded from inquiring into the validity of an ordinance avowedly within the police power of the city, if not arbitrary, unreasonable, and unequal. The fact that the city of Los Angeles occupies a large amount of territory, extends more than 40 miles in a north and south direction, and nearly 20 miles in an east and west direction at its extreme boundaries, and contains an area of 450 square miles, and that there are large areas of unoccupied land in the residence zone, is not material to the questions presented by the case at bar. The appellants' property is in the line of development of the city, whose rapidity of development is almost unprecedented. The uniform rule is that persons seeking to avoid the effect of an ordinance because it is unreasonable must show that it is unreasonable as to them, and cannot predicate their claims upon the fact that the ordinance may be unreasonable as to others.

Appellants base their claim to the invalidity of the zoning ordinance in part on the ground that the city council of Los Angeles permitted them to enter upon their project of oil development, and then, after they had expended $136,000 in preliminary work, repealed the ordinance permitting them to develop oil and enacted an ordinance prohibiting the same. In this connection they rely very strongly on the case of Dobbins v. Los Angeles, 195 U. S. 223, 25 S. Ct. 18, 49 L. Ed. 169. Before passing on this question, additional facts should be stated.

The area in which appellants' land is located was annexed to the city of Los Angeles, part in 1915 and part in 1923. Thereafter an ordinance was enacted annexing this territory to the residence zone already established in the city of Los Angeles. Application was made by the appellants to the city planning commission for recommendation to the city council of an ordinance excluding a portion of appellants' land from the residence district, and thus to permit the development of oil thereon. This ordinance was passed in 1926, by which the appellants' land, except a strip 100 feet wide around the outer boundary thereof, and certain other portions not material here, were excepted from the residence district. On the faith of this ordinance, the expenditures above mentioned were incurred, but eventually, by reason of protest from owners of residences in the neighborhood, the city repealed the last-mentioned ordinance and reincorporated said land in the residence district, thus, in effect, making unlawful that which it had declared to be law-

ful by the ordinance upon which appellants acted. The effect of this action of the city council is to cause a direct loss to the Standard Oil Company of California to the amount of these expenditures. The situation is somewhat analogous to that disclosed in the case of Dobbins v. Los Angeles, supra, with this notable exception, that in that case the facts stated in the bill were admitted by a general demurrer and the lower courts had sustained the ordinance notwithstanding the allegation in the bill. These allegations were to the effect that, not only was there no change in the conditions after the enactment of the ordinance permitting the erection of the gas works by Mrs. Dobbins, but that the neighborhood was occupied by oil refineries, etc., and that the city council enacted the second ordinance, not for the purpose of protecting the people in the neighborhood, but for the purpose of granting a monopoly to another gas company operating in another district. It was alleged and admitted that there was no other reason for the enactment of such an ordinance. In that case counsel relied upon the presumption in favor of the validity of the legislation and a wise exercise of legislative judgment and ignored the allegations tending to show that the exercise of power in that case was not only unreasonable, unequal, arbitrary, and unjust, but corrupt. In the case at bar the situation is almost reversed. In this case the city attempted to show the proceedings before the city planning commission and the evidence there adduced for the purpose of sustaining the action of the city council, based upon the recommendation of the planning commission, as reasonable under the circumstances, and the appellants objected to that evidence upon the ground that the "court cannot inquire into the motives of the city council which prompted the council to enact the ordinance, nor into the facts before the council at the time it acted." Whether or not it was necessary to fortify the presumption in favor of the validity of the legislation need not be determined, but it is clear that the appellants are in no position to assert that the motives for the enactment of the legislation were improper, and they do not do so, but rely entirely upon the evidence as to the nature and character of the property and the surrounding territory as demonstrating that the ordinance was, however well intentioned, entirely unreasonable and arbitrary. It has uniformly been held that there is no vested right in a permit or an ordinance of the nature of that involved here, by which the boundaries of the residential zone were changed to exclude appellants' property therefrom. That being true, appellants are without remedy unless on the whole it can be said that the final action of the city council, by which it again included their property in the residence zone, was so wholly unreasonable and unjustifiable under the circumstances as to be void. In this connection it is proper to consider the changes in the situation of the parties brought about by the ordinance excluding the lands of appellants from the residence district, but a mere change of policy or of legislation, however unfortunate the result may be to appellants, does not justify the courts in declaring void an ordinance exercising legitimate police power. The loss suffered by the appellants by reason of this change in legislative policy is no more a taking of their property than is the loss resulting to them by reason of being deprived of the right to develop the oil on their property or the right to use their land for other than residence purposes.

Judgment affirmed.

SAWTELLE, District Judge (concurring).

There is no question in this case of the power of the city of Los Angeles to enact zoning laws, for the highest courts of the states and of the federal government have upheld the right of a municipality to place reasonable restrictions upon property development within its own limits. The demands of modern urban life, the growth of civic spirit, the ever-increasing necessity of social control for the general welfare—all of these factors have brought about an increased attention to city planning. Nowhere, perhaps, is such a plan more necessary than in a city like Los Angeles, whose area is larger than that of many counties, and whose basic development has been that of a residential community. So long as the duly constituted authorities of this or of any other city proceed to enact zoning laws in a manner that is not arbitrary and does not deprive citizens of their constitutional rights, then the court will not interfere. Even in cases where the validity of the legislative classification for zoning purposes is fairly debatable, the legislative judgment must be allowed. Radice v. New York, 264 U. S. 292, 44 S. Ct. 325, 68 L. Ed. 690.

There is nothing in the record to show or even indicate that the legislative body acted arbitrarily or without warrant of law, and, this being so, the courts have not the right to review or annul their action. The trial judge ruled out testimony concerning the manner in

which the passage of the original excepting ordinance was effected and which by implication allows the property of the appellants to be considered as industrial rather than as residential, and there is nothing in the record as it stands to indicate that the revoking of that permission was more arbitrary than the granting of it. It is admitted by the appellees that the Standard Oil Company, acting under rights allowed it by the permissive ordinance, had expended certain sums of money in preparation for drilling an oil well upon the property in question, but the prohibitive ordinance was no more an arbitrary taking of the money so expended than was the permissive ordinance an arbitrary destruction of property rights that had been created by the investment of large sums of money in the Monte Mar Vista Tract, Glenville Square, Cheviot Hills, Walter G. McCarthy-Beverly Business Center, and the Pacific Military Academy, all real estate developments near enough to the land of the appellants as to be affected by the character of development permitted there.

In formulating its zoning laws, the city of Los Angeles did not attempt to prohibit pumping oil from wells already drilled. But to prohibit oil development in an area not heretofore used for that purpose involves a different question, one in which we cannot deny that the city of Los Angeles acted within its powers. The courts have held that a city may prevent an owner's selling his property for business purposes when the value as business property is 100 or 200 per cent. greater than the value as residential property, Zahn v. Board of Public Works, 195 Cal. 497, 234 P. 388; Id., 274 U. S. 325, 47 S. Ct. 594, 71 L. Ed. 1074; the question is similar in this case. There is not a complete destruction of property rights, for the trial court found that the value of this property for residential purposes was at least $10,000 per acre, whereas its value for industrial development, that is, drilling for oil, was purely speculative.

The Standard Oil Company and the Marblehead Land Company are in no position to assert that they have been misled or deprived of a constitutional right. They knew the facts as to the development of the surrounding property and that several high-class residential districts had been built up whose value would be greatly impaired by oil development in their vicinity. The appellants must have realized that the granting of special privileges to themselves would have a harmful effect on the property of those around

them; they must have realized also that the dominant trend of the city's development was residential and that to interfere with or check that growth would be harmful to the city as a whole, and that industrialization of any area in the general line of residential growth would be contrary to the whole plan of the zoning commission. In the absence of any evidence to the contrary, the ordinance whereby the city of Los Angeles denied to the appellants the right to drill for oil on their land seems to be a logical part of the general scheme of growth, and not an arbitrary act working undue hardship on persons or corporations.

RUDKIN, Circuit Judge (dissenting).

During his lifetime, Judge DIETRICH prepared an opinion in this case reversing the decree of the court below, in which I concurred. For the reasons there stated, I feel constrained to dissent from the majority opinion. The opinion of Judge DIETRICH follows:

"The appellants brought this suit to enjoin the enforcement against them of a zoning ordinance of Los Angeles, prohibiting the drilling for oil within a certain district of the city; they will hereinafter be referred to as the land company and the oil company. The former is the owner and the latter is the lessee of a tract of approximately 290 acres within such district. The lease was given to enable the lessee to explore for oil, and, if oil is found, to extract it. The municipal limits were extended to include a part of the tract, together with other lands, in 1915, and the remainder in 1923. In 1916, the city adopted a general ordinance zoning its entire territory and prohibiting within the residence zone certain classes of business, including that of drilling for oil. Originally the tract in question was not affected thereby, but by amendment on June 15, 1926, the residence zone was enlarged to include it, and thereupon it became subject to the restriction. In response to an application made by the land company, the city, on March 31, 1927, passed another ordinance exempting a portion of the tract from the restriction and permitting drilling thereon for oil. Immediately following the passage of this ordinance and in reliance thereon, the plaintiffs executed the agreement of lease hereinbefore referred to, and pursuant to the terms thereof the oil company paid to the land company $75,000. The oil company at once entered upon the property, and, in constructing a road, erecting a derrick with standard equipment for

oil drilling, and securing other leases on adjacent property, it made expenditures aggregating $136,000—a total outlay upon its part of $211,000. Thereafter, on May 19, 1927, apparently for the purpose of nullifying the permission to drill, another ordinance was passed purporting to place all the property of the land company within the residence district. Whether this ordinance was in reality effective for the purpose, we need not stop to consider, for on August 8, 1927, still another ordinance was passed amending the original ordinance of 1916 by repealing the permissive ordinance of March 31, 1927. Thus confronted with a group of ordinances purporting to put an end to their enterprise, the plaintiffs, on December 9, 1927, commenced this suit, to have them declared ineffective for that purpose and the city officers enjoined from enforcing them. The city answered, and, after hearing the evidence offered, which bears largely upon the general question of the relation of the restriction to the safety and general welfare of the community, the court below entered a decree denying plaintiffs any relief and dismissing their bill. From the decree so entered, plaintiffs prosecute this appeal.

"Subject to certain constitutional limitations, the governing body of a city, invested with the requisite authority, may divide its territory into residence and other districts. Euclid v. Ambler Realty Company, 272 U. S. 365, 47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016; Zahn v. Board of Public Works, 274 U. S. 325, 47 S. Ct. 594, 71 L. Ed. 1074. If the reasonableness of the classification is fairly debatable, the courts will afford no relief. Id. But 'the governmental power to interfere by zoning regulations with the general rights of a land owner by restricting the character of his use is not unlimited, and other questions aside, such restriction cannot be imposed if it does not bear a substantial relation to the public health, safety, morals, or general welfare.' Nectow v. Cambridge, 277 U. S. 183, 188, 48 S. Ct. 447, 72 L. Ed. 842. And a zoning ordinance may be valid in its general scope and plan but violative of constitutional inhibitions in its application to a specific piece of property. Euclid v. Ambler Realty Company, 272 U. S. 365, 397, 47 S. Ct. 114, 71 L. Ed. 303, 54 A. L. R. 1016; Nectow v. Cambridge, 277 U. S. 183, 48 S. Ct. 447, 72 L. Ed. 842; State of Washington v. Roberge, 278 U. S. 116, 49 S. Ct. 50, 73 L. Ed. 210. Each case must be adjudged in the light of its own facts.

"In its extreme limits the territory of the city of Los Angeles extends for a distance of nearly 40 miles from north to south and 20 miles from east to west, and in area embraces approximately 450 square miles. The tract in question lies about 7 miles westerly from what may be regarded as the heart of the city. While, as we have seen, it was annexed partly in 1915 and partly in 1923, no portion of it has ever been subdivided into lots or blocks or used for city purposes; upon it there is but one house, and, with the exception of the oil-drilling enterprise herein involved, it has always been either barren or devoted exclusively to farming purposes. The entire area (approximately 400 acres) covered by the oil company's leases is measurably compact and may be visualized as a square with a rectangular tract cut out of the northeast corner, the southeast corner, the southwest corner, and the south central portion. Westerly from the northerly section extend country or golf clubs for a distance varying from a quarter of a mile to a mile, and from the southern part the Monte Mar Vista residence tract comprising 100 acres. South of the southwest portion is another country club. Projecting into the leased area from the south for a distance of about 1,200 feet is a strip 300 or 400 feet wide belonging to and occupied by the Pacific Military Academy. For several hundred feet south of the southeast portion apparently there are no residences. Easterly and northerly from the leased area, with the exception of the extreme northwesterly portion, the territory is devoted to residential purposes and is occupied to some degree by residences. The oil company's derrick is located a little more than 100 feet east of the west boundary line of the leased area and about midway north and south. The only residence section in that vicinity is the Monte Mar Vista tract, from the derrick to the nearest point of which is about 500 feet. Upon the tract there are approximately twenty-five residences, the closest one being 1,100 feet from the derrick. To the nearest of the other residence sections it is approximately half a mile. Upon the Monte Mar Vista tract expenditures aggregating $600,000 have been made in grading, paving, and the construction of other public improvements, and the residences thereon were erected at a cost of approximately $785,000. Neither it nor other nearby residence tracts have sold or built up rapidly. Witnesses submitted widely diverse estimates, which of necessity are measurably speculative, touching the value of the leased property for residence purposes, and for oil.

"The grounds on which it is sought to justify the prohibition against drilling are (1) that some dust arises from the passing of vehicles to and from the derrick; (2) that the operation of the drill is attended with noise; (3) that, if and when gas is encountered, offensive odors will be emitted; and (4) that in such contingency there will be an additional fire hazard. Unless care is exercised there is possibility of fire in sinking a test well, but, considering the distance to the closest dwelling house or other structure, and assuming due precautions, the hazard in this respect from the well in question is thought to be negligible. While our consideration has to do more particularly with the existing derrick, which is in closer proximity to the Monte Mar Vista tract than is any other point in the plaintiffs' territory, and the operation of which has been subjected to no public regulations, it is to be borne in mind that the prohibition of the ordinance is absolute and from its operation is not excepted any derrick though it may be located at a much more remote point and operated under strict regulations having for their object the elimination or the reduction to a minimum of the asserted objectionable conditions. The city has not attempted by reasonable regulations to accomplish what it seeks by the absolute prohibition, and thus to preserve a measure, at least, of the value of the property right which it would wholly destroy.

"In two aspects the case is unusual though not entirely unique. As we have seen, acting in reliance upon the permissive ordinance, the lessee laid out over $200,000 in preparation for drilling. While it is not suggested that the city thus became bound as by a contract, or its officers estopped from any appropriate exercise of the police power, the circumstance is not wholly immaterial. With no intervening change of conditions, we have, as against a finding of necessity, another finding by the same body of no necessity. If the latter does not impair the force of the former, it at least has a tendency to show that the question is not free from great doubt. And, where the citizen has thus been led in good faith to make large expenditures, his investment should not be destroyed if there is any other reasonable way by which the safety and well-being of the community may fairly be conserved. See Dobbins v. Los Angeles, 195 U. S. 223, 25 S. Ct. 18, 49 L. Ed. 169.

"In the second place, differing from most **of** the cases where such controversy has arisen, the ordinance under consideration affects the inherent value of a natural resource which can be utilized only upon the ground. Ordinarily enactments against the conduct of a certain line of business within a defined zone do not destroy the business, for it may be carried on within a district designated for that purpose. True, land values in the restricted zone may thus be affected, but generally such values are not inherent but in the nature of unearned increments; the community is only taking back a part of that which it has contributed, and the property owner is still the beneficiary of a value which not he but the community has created. Not without analogy is Pennsylvania Coal Company v. Mahon, 260 U. S. 393, 43 S. Ct. 158, 159, 67 L. Ed. 322, 28 L. Ed. 1321, involving a statute forbidding the mining of anthracite coal in such a way as to cause, among other things, the subsidence of any structure used as a human habitation. In holding the statute invalid as applied to the particular case, the court said:

"'Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act. * * *

"'It is our opinion that the act cannot be sustained as an exercise of the police power, so far as it affects the mining of coal under streets or cities in places where the right to mine such coal has been reserved. * * * To make it commercially impracticable to mine certain coal has very nearly the same effect for constitutional purposes as appropriating or destroying it. This we think that we are warranted in assuming that the statute does. * * *

"'The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. A similar assumption is made in the decisions upon the Fourteenth Amendment. Hairston v. Danville & Western Ry. Co., 208 U. S. 598, 605, 28 S. Ct. 331, 52 L. Ed. 637, 13 Ann. Cas. 1008. When this

seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States.

" 'The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking. * * *

" 'We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change. As we already have said this is a question of degree—and therefore cannot be disposed of by general propositions. But we regard this as going beyond any of the cases decided by this court.'

"The validity of the distinction we are considering was seemingly recognized in Hadacheck v. Sebastian, 239 U. S. 394, 36 S. Ct. 143, 60 L. Ed. 348, Ann. Cas. 1917B, 927; Id., 165 Cal. 416, 132 P. 584, L. R. A. 1916B, 1248; and was expressly sustained In re Kelso, 147 Cal. 609, 82 P. 241, 2 L. R. A. (N. S.) 796, 109 Am. St. Rep. 178, and in Village of Terrace Park v. Errett, 12 F.(2d) 240, 243. In the latter case the Circuit Court of Appeals of the Sixth Circuit said: 'There is also a substantial difference between an ordinance prohibiting manufacturing or commercial business in a residential district that may be conducted in another locality with equal profit and advantage, and an ordinance

that wholly deprives the owner of land of its valuable mineral content.'

"We are unable to escape the conclusion that, in its absolute prohibition of any and all drilling operations upon a tract of such magnitude and so situated with respect to sections actually used for residence purposes, the ordinance is unnecessarily drastic. To say the least, the conditions to which we have just referred strongly emphasize the rule that restriction should not outrun necessity, and that in the legitimate exercise of the police power there must be some reasonable relation between the public good to be subserved and the private loss entailed. To what extent the city may restrict the extraction of oil if it is found we need not at this juncture consider. The present operation is exploratory; by it the plaintiff seeks only to determine with certainty whether they have oil. It is not a 'wild cat' or 'stock jobbing' scheme, but a legitimate enterprise, intelligently undertaken by men of experience in the industry, who, in the large outlay already made, have shown their faith by their works. With reasonable regulations the operation may be continued without substantial injury or menace to the public health, safety, morals, or general welfare, and under such circumstances an absolute prohibition is thought to be arbitrary and unwarranted. If and when the plaintiffs discover oil, consideration may be appropriately given to the question whether under any mode of operation then known it may be extracted without seriously affecting the health, safety, or well-being of the community, by setting at large noxious or inflammable gases, or otherwise creating conditions constituting a nuisance.' "