## GENEVA INV. CO. v. CITY OF ST. LOUIS, MO.

### No. 10588.

Circuit Court of Appeals, Eighth Circuit.
Jan. 8, 1937.

Malcolm I. Frank, of St. Louis, Mo. (William M. Fitch, of St. Louis, Mo., on the brief), for appellant.

Oliver Senti, Associate City Counselor, of St. Louis, Mo. (E. H. Wayman, City Counselor, Luke E. Hart, and Forrest C. Donnell, all of St. Louis, Mo., on the brief), for appellee.

Before GARDNER, WOODROUGH, and THOMAS, Circuit Judges.

GARDNER, Circuit Judge.

This is an appeal from a decree dismissing appellant's bill of complaint by which it sought to enjoin appellee from enforcing an amended zoning ordinance.

Appellant, a corporation, on September 4, 1925, purchased property known in the record as lot 50, city block 5419, located at the northeast corner of the intersection of Skinker boulevard and Kingsbury avenue, fronting south on Kingsbury avenue, in the City of St. Louis. In 1907, a deed to this and adjoining property had placed restrictions on its use, but these restrictions expired January 1, 1923.

In 1925, the Legislature of the state of Missouri passed an act. (Laws Mo.1925, p. 307 [Mo.St.Ann. § 7259 et seq., p. 5855 et seq.]), which authorized the creation of building or use zones or districts in certain cities, which included the City of St. Louis. It empowered such cities to regulate and restrict, among other things, the use of buildings, structures, and land for trade, industry, residence, or other purpose. To that end the legislative body of the city was authorized to divide the municipality into districts of such number, shape, and area as might be best suited to carry out the purposes of the act, and to regulate and restrict the erection, construction, and use of buildings, structures, and land within such districts. Such regulations were required to be uniform for each class or kind of buildings throughout each district, and they were also required to be made "with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the values of buildings and encouraging the most appropriate use of land throughout such municipality."

Sections 4 and 5 of the act (Mo.St. Ann. §§ 7262, 7263, pp. 5857, 5858) are as follows:

"Sec. 4. *Powers and limitations of legislative body in city—hearings, notice to be given.* The legislative body of such municipality shall provide for the manner in which such regulations and restrictions and the boundaries of such districts shall be determined, established, and enforced, and from time to time amended, supplemented, or changed. However, no such regulation, restriction, or boundary shall become effective until after a public hearing in relation thereto, at which parties in interest and citizens shall have an opportunity to be heard. At least 15 days' notice of the time and place of such hearing shall be published in an official paper or a paper of general circulation in such municipality.

"Sec. 5. *Regulations, restrictions and boundaries may be changed—procedure.* Such regulations, restrictions, and boundaries may from time to time be amended, supplemented, changed, modified or repealed. In case, however, of a protest against such change duly signed and acknowledged by the owners of ten per cent

or more, either of the areas of the land (exclusive of streets and alleys) included in such proposed change or within an area determined by lines drawn parallel to and one hundred and eighty-five (185') feet distant from the boundaries of the district proposed to be changed, such amendment shall not become effective except by the favorable vote of three-fourths of all the members of the legislative body of such municipality. The provisions of the previous section relative to public hearing and official notice shall apply equally to all changes or amendments."

Pursuant to the authority granted by this statute, the board of aldermen of the City of St. Louis, on April 26, 1926, enacted Ordinance No. 35,003, which divided the city into "use" districts, and limited and defined the use to which property in the several districts might be put. There were five "use" districts created, viz: (1) Residence; (2) multiple dwelling; (3) commercial; (4) industrial; and (5) unrestricted.

Section 21 of this original zoning ordinance is as follows:

"The Board of Aldermen may from time to time, on its own motion or on petition, after public notice and hearings as provided by law, amend, supplement or change the boundaries or regulations herein or subsequently established. In case, however, of a protest against such changes duly signed and acknowledged by the owners of ten (10) per cent or more, either of the areas of the land (exclusive of streets and alleys) included in such proposed change or within an area determined by lines drawn parallel to and one hundred and eighty five (185') feet distant from the boundaries proposed to be changed, such amendment shall not become effective except by the favorable vote of a majority of all the members of the Board of Aldermen."

By the provisions of this ordinance, a strip of land 90 feet in width, abutting on and adjoining the east side of Skinker boulevard, was zoned as being in the commercial district. Appellant's property lies within this area. That section of the city lying between Rosedale avenue on the east, Delmar boulevard on the north, Skinker boulevard on the west, and the railroad tracks on the south, constitutes a subdivision called Washington Heights. All of this territory except that lying between Delmar boulevard and the alley immedi-

ately south thereof was divided into lots which fronted on the avenues running east and west. In addition to the 90-foot strip placed in the commercial district by the original zoning ordinance, other parts of Washington Heights were zoned as follows, commencing with the railroad tracks on the west: (1) From the right of way of the railway north to the alley south of McPherson avenue, a multiple dwelling district; (2) from this alley to the alley south of Delmar boulevard, a residential district; (3) all the property north of the alley, south of Delmar boulevard and east of Skinker boulevard, an industrial district. As has already been observed, the 90-foot strip placed by the zoning ordinance in the commercial district embraced appellant's property.

On November 18, 1930, appellant's property being in the commercial district as established by this ordinance, it applied to the proper officers of the city for a permit to install gasoline tanks and pumps on its property, and a permit so to do was issued on that date. On November 25, 1930, it was granted a building permit to erect a gasoline filling station on its property. Each permit by its terms expired one year from date. In the meantime, appellant entered into a contract to sell its property for $72,000, dependent upon the erection of the filling station. On October 6, 1931, before it had done any substantial work toward erecting the gasoline filling station, both permits were revoked on the ground that the property was then located in a multiple dwelling district. It should be observed in passing that appellant was delayed in erecting its filling station by an injunction issued by a state court restraining the erection. This cause has not been tried, but by consent of the parties has been continued from time to time. When its permits were revoked, appellant applied to the Supreme Court of Missouri, at its October, 1931, term, for a writ of mandamus to compel the officers of the city to reinstate the permits, asserting that Ordinance No. 38,758, hereinafter referred to, was invalid, and as its reason for not having proceeded with the construction of its gasoline filling station and the installation of gasoline tanks, the pendency of the injunction suit was pleaded. The Supreme Court of Missouri denied this application.

Ordinance No. 38,758, just referred to, was passed by the board of aldermen of

the City of St. Louis December 6, 1930. It amended original Ordinance No. 35,003 by extending the residence district to include all the property which faced Kingsbury avenue between Rosedale avenue and Skinker boulevard that had previously been classified as a commercial district, thereby removing from the 90-foot commercial district above described two pieces of property, one the property of appellant, and the other a property directly across the street on the southeast corner of the intersection of Skinker boulevard and Kingsbury avenue. Appellant and the owner of the other corner lot so excluded had protested against the passage of the proposed ordinance, but it was passed by an affirmative vote of all members of the board of aldermen and duly approved.

When appellant purchased its property, there was a substantial residence thereon, the main entrance to which was on Kingsbury avenue, and this structure still remains on the lot. At the time of the passage of the amending ordinance extending the residential districts on both sides of Kingsbury avenue westward to Skinker boulevard, there were no commercial structures on the east side of Skinker boulevard between the above-mentioned multiple dwelling district in the south end of Washington Heights subdivision and the unrestricted district in the north end of Washington Heights subdivision, except a building occupied by stores and a gasoline filling station on lots immediately north of the multiple dwelling district, and a filling station on the lot immediately north of and across the alley from appellant's property. The northeast corner of Washington boulevard and Skinker boulevard was occupied by a church, a permissible use in the residential district, and all other lots in the whole of Washington Heights subdivision from Rosedale avenue to Skinker boulevard, and between the multiple dwelling district and the industrial dwelling district shown, located along and abutting Delmar boulevard, were occupied by single family residences. The block known as 6100 Kingsbury avenue, in which the appellant's property is located, extends from Rosedale avenue on the east to Skinker boulevard on the west, and is and has for many years been maintained as a residential block, occupied by forty-three dwellings practically uniform in structure, each costing not less than $10,000. A uniform building line of about 30 feet has been observed and maintained in the block; lawns

in front of the buildings are terraced and maintained in good condition. At each end of the block, large stone pillars were erected and maintained on both sides of the street, giving to the block an appearance of privacy and seclusion. On the east side of Skinker boulevard, between Delmar boulevard and Pershing avenue, there are four brick residences, each occupying half a block. Skinker boulevard is not restricted as to the volume or nature of the traffic carried thereon, and this is practically true of all streets in the City of St. Louis, regardless of restrictions and limitations as to the use of the property fronting or abutting the street. A double line of street car tracks has been in use on Skinker boulevard since 1898. That part of Skinker boulevard adjacent to Washington Heights has not developed into a commercial street to any greater extent than all other streets in the City of St. Louis which are unrestricted as to the volume or character of traffic thereon and are so located that they are extensively used. Appellant's property was estimated to be worth $57,500 to $65,000 for commercial purposes, and from $13,000 to $15,000 for residence purposes, in 1929 and 1930.

The court entered specific and comprehensive findings of fact, finding, among other things, as follows:

"That the enactment of Ordinance 38,758 was the consummation of a part of a general plan to preserve, so far as practicable, the residential character of that part of the area of Washington Heights between the Multiple Dwelling District in the south end thereof and the Industrial District in the north end thereof, and to promote the development of said area and of Parkview Subdivision for residential purposes, and to prevent the further encroachment of commercial establishments in that part of Washington Heights between the Multiple Dwelling District in the south end thereof and the Industrial District in the north end thereof. * * *

"That Ordinances 38,758 and 39,398 were enacted to carry into effect the purposes of the General Zoning Ordinance, and to rectify an erroneous classification of land with respect to the use thereof, made when all of the lands of the City were being zoned."

It should perhaps be noted that by Ordinance No. 39,398, enacted after the adoption of Ordinance No. 38,758, the residential district was extended so as to include

all lots in Washington Heights from the northern boundary of appellant's lot to the industrial district beginning at the alley south of Delmar boulevard.

A decree was entered dismissing appellant's bill of complaint, from which appellant prosecutes this appeal. The grounds upon which a reversal of this decree is sought may be summarized as follows: (1) The city was without power to amend the original zoning ordinance because provision for amendment was void in that it attempted to provide that it could be amended by a vote of a majority of all members of the board of aldermen, notwithstanding a protest had been filed; (2) if the amending ordinance was regularly enacted, it is nevertheless void as applied to appellant because it deprives it of its property without due process of law, and denies it the equal protection of the law.

■ 1. The provision of Ordinance No. 35,003 providing in effect that an amendment thereto could become effective on the affirmative vote of a majority of all the members of the board of aldermen, notwithstanding a protest against such amendment had been properly made, is in conflict with the statute conferring power upon the municipality to enact such legislation. The statute requires a favorable vote of three-fourths of all the members if proper protest shall have been made. This part of the ordinance is manifestly void, and appellant contends that this void provision destroys that part of the ordinance relating to amendments so that there was no valid municipal legislation on the subject of amendment, and hence the amending ordinance was void. The authority upon which appellant strongly relies is State ex rel. Burns v. Gibson, 195 Mo. 251, 94 S.W. 513, 515.

Section 8 of article 9 of the Constitution of Missouri provided as follows:

"The General Assembly may provide, by general law, for township organization, under which any county may organize whenever a majority of the legal voters of such county, voting * * * at any general election, shall so determine."

Section 8427 of the Revised Statutes Mo. 1889 provided as follows:

"If it shall appear by the returns of said election that a majority of the legal voters of the county, voting at said election for and against township organization, are for such organization, then the county so voting in favor of its adoption shall be governed by and subject to the provisions of this chapter, on and after the last Tuesday in March next succeeding."

In the Gibson Case, the court held that the above-quoted provision of the Constitution was not self-executing and self-enforcing. The court said the test was "whether the language of a constitutional provision is addressed to the courts or the Legislature"; whether it indicated that it was intended as a present enactment complete in itself as definitive legislation, or contemplated subsequent legislation to carry it into effect. The court concluded that it was plain that the constitutional provision was addressed to the Legislature, and that it was intended there should be legislation in order to put its provisions in force. The same principle was announced by the Supreme Court in Davis v. Burke, 179 U.S. 399, 21 S.Ct. 210, 212, 45 L.Ed. 249, in which the court said:

"Where a constitutional provision is complete in itself it needs no further legislation to put it in force. When it lays down certain general principles, as to enact laws upon a certain subject, or for the incorporation of cities of certain population, or for uniform laws upon the subject of taxation, it may need more specific legislation to make it operative. In other words, it is self-executing only so far as it is susceptible of execution. But where a constitution asserts a certain right, or lays down a certain principle of law or procedure, it speaks for the entire people as their supreme law, and is full authority for all that is done in pursuance of its provision. In short, if complete in itself, it executes itself."

The Supreme Court of Missouri has spoken on this question in two later cases. In State ex inf. v. Kansas City, 233 Mo. 162, 134 S.W. 1007, 1012, the court had before it section 16 of article 9 of the Constitution of Missouri, which has to do with the amendment to city charters, and which reads as follows:

"Such charter, so adopted, may be amended by a proposal therefor, made by the law-making authorities of such city, published for at least thirty days in three newspapers of largest circulation in such city, one of which shall be a newspaper printed in the German language, and accepted by three-fifths of the qualified voters of such city, voting at a general or special election, and not otherwise; but

such charter shall always be in harmony with and subject to the Constitution and laws of the State."

A similar provision was found in the state statutes, but the city charter provided that before an amendment to the charter should be of any force and effect, it should be 'submitted to and accepted by three-fifths of the qualified voters of Kansas City at a general or special election provided by ordinance for such purpose. The Supreme Court of Missouri held that the constitutional requirement could not be either lessened or increased by the city, and that prohibitory constitutional provisions were self-executing without regard to legislative sanction. The contention was there made that if the charter provision in regard to the required majority of votes was void, then the whole proceedings for an amendment were void, and this is in effect the contention urged here by plaintiff. In disposing of that argument, the court said:

"Section 7, art. 1, of the charter makes provision in detail for the several steps necessary to be taken in amending the city charter so as to extend the limits of the city, including the passage and publication of an ordinance, the holding of a special election, canvassing the vote and declaring the result, upon all of which the Constitution is silent, very properly leaving the same for charter regulation. This section also contained a provision as to the vote necessary for the adoption of the amendment, *but as that vote was already definitely fixed by the Constitution, no charter provision was required, and that part of the section attempting to prescribe a different vote may be treated as void, without in any manner affecting the validity of the many other and independent provisions of the section.* [Italics supplied.] No proposition of law is better settled than that, 'when the provisions of an act or ordinance are separable, if the act or ordinance, excluding the unconstitutional parts is capable of being exercised in conformity with the legislative intent, the whole act will not be declared void,' and no case can be instanced more aptly illustrative of this doctrine than that of said section 7 of respondent's charter."

In a still later case, State ex inf. v. Duncan, 265 Mo. 26, 175 S.W. 940, 944, Ann.Cas.1916D, 1, the opinion in which was written by Judge Faris, now a member of this court, the court considered section 9 of article 9 of the State Constitution, which provides as follows:

"In any county which shall have adopted 'township organization,' the question of continuing the same may be submitted to a vote of the electors of such county at a general election, in the manner that shall be provided by law; and if a majority of all the votes cast upon that question shall be against township organization, it shall cease in said county; and all laws in force in relation to counties not having township organization shall immediately take effect and be in force in such county."

The legislation under consideration by the court provided for submitting the question of the continuance of township organization, but provided that the question should be decided by a majority of all the votes cast at the election. It was there contended, as here, that the statute, not having followed the Constitution as to the number of votes required, was utterly void; that in legal effect the Legislature had simply failed to legislate. Holding that the questioned section of the Constitution was in part not self-executing, Judge Faris, speaking for the court, said:

"On the other hand, the last clause is just as obviously self-executing; for it is clear that it needs no statute to put it in force. Any statute about the matter must needs follow the precise words or the very substance of the Constitution itself, and no statute which could be passed could clarify the matter in any respect whatever. Indeed, the clause under discussion merely expresses a status which will instantly result from the election required to be held. Statutory language would be impotent to add aught to the Constitution's expression of this resulting status, and so the clause is self-executing. It is a provision complete in itself, and needs no legislation to put it in force. * * * No reason can be seen why such a condition is not permissible under the facts here; that is to say, why one clause of a given section of a Constitution may not be self-executing, and another clause or clauses of the same section not self-executing. Indeed, we have held that such a condition may exist without doing violence to the organic law. Sharp v. Biscuit Co., 179 Mo. 553, 78 S.W. 787."

The teaching of these two Missouri cases is controlling here. The enabling act, which authorized cities to pass zoning ordinances, provided that the legislative

body of the municipality should make provision for the manner in which regulations and restrictions and the boundaries of districts should be determined, established, and enforced, and from time to time amended, supplemented, and changed. No such regulation, restriction, or boundary was to become effective until after a public hearing at which parties in interest were to have the right to be heard, after notice given. Provision is made in section 5 of the act (Mo.St.Ann. § 7263, p. 5858) for amendments, supplements, changes, modifications, or repeals.

It is observed that the provisions of section 4 (Mo.St.Ann. § 7262, p. 5857) relative to public hearing and official notice apply equally to all changes or amendments, but a distinct and complete enactment is made as to protests. Nothing is delegated to the city legislative body with reference to protests. No legislation is required to put it in force, and none is contemplated by the statute.

 The principle announced in State v. Gibson, supra, is not inconsistent with the later cases. In the Gibson Case, the whole matter was submitted to action by the Legislature. No part of the constitutional provision became effective until embodied in legislation. As held in McGrew Coal Co. v. Mellon, 315 Mo. 798, 287 S.W. 450, if a law is to be passed to enforce the constitutional provision as a whole, no part of it is self-executing. But we are clear that such is not the case here. The provision as to protest is complete in itself, needs no legislation to put it in force, and, hence, is self-executing. We conclude on this branch of the case that the ordinance, having been adopted by the unanimous vote of the governing body, was properly enacted.

 2. This brings us to a consideration of the question whether the amended ordinance is a valid exercise of the police power of the city or is invalid because arbitrary and unreasonable.

The enabling statute granted the city power to amend, supplement, change, modify, or repeal any regulation, restriction, or boundary, but notwithstanding this sweeping grant of power it must be exercised reasonably and not arbitrarily, and the zoning ordinance regulating the use to which real estate in particular localities may be put, must have a tendency to promote the public health, public safety, or public welfare of the inhabitants, and it must not be discriminatory. Appellant purchased its property before zoning ordinances were enacted. As has been noted, it obtained its permit to erect a filling station and to install gasoline tanks in November, 1930. At that time the original zoning ordinance was in effect, but on December 6, 1930, the amending ordinance was passed and became effective at once. On October 6, 1931, the city revoked plaintiff's permits. The amending ordinance was introduced on November 14, 1930. One witness testified that the city revoked the building permits in the summer or fall and that "the city police came out and threatened to arrest the workmen who were wrecking the old residence building and doing other work in preparation for the filling station. We were compelled to stop work on the improvements." There is, however, no testimony as to how much, if anything, appellant expended, nor does it appear that any work was done or money expended before the amending ordinance went into effect, or at least was introduced. The circumstances recited are not sufficient basis on which to base an estoppel against the city from enforcing the ordinance. De Lano v. City of Tulsa (C.C.A.8) 26 F.(2d) 640. The building permits created no vested right, but were subject to revocation by the proper exercise of police power. The amending ordinance had the effect of revoking the permits. Kingshighway Presbyterian Church v. Sun Realty Co., 324 Mo. 510, 24 S.W. (2d) 108; State ex rel. v. Christopher, 317 Mo. 1179, 298 S.W. 720.

 If the city, in the first instance, could lawfully have restricted the use to which appellant might put its property, then appellant cannot complain of the amending ordinance. The power to amend cannot, of course, be arbitrarily exercised any more than the original power to pass the zoning ordinance can be exercised in an unconsitutional or unreasonable manner. In Marblehead Land Co. v. City of Los Angeles (C.C.A.9) 47 F.(2d) 528, the court upheld the power to amend a zoning ordinance so as to include in a residential district property which by the original ordinance was excluded therefrom. Under the authority of the controlling decisions, the question presented is whether the reasonableness of the ordinance is debatable. If so, it must be upheld as valid. Zahn v. Board of Public Works, 274 U.S. 325, 47

S.Ct. 594, 71 L.Ed. 1074; Euclid, Ohio, v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 119, 71 L.Ed. 303, 54 A.L.R. 1016; Women's Kansas City St. Andrew Soc. v. Kansas City, Mo. (C.C.A.8) 58 F.(2d) 593, 601; American Wood Products Co. v. City of Minneapolis (C.C.A.8) 35 F.(2d) 657; Marblehead Land Co. v. City of Los Angeles (C.C.A.9) 47 F.(2d) 528.

■ The loss sustained by appellant through depreciation of value, if the ordinance is sustained, while proper for consideration by the court, is not controlling, for if the police power is properly exercised, loss to the individual is a misfortune which he must undergo as a member of society. As said by the Supreme Court of California in Zahn v. Board of Public Works, 195 Cal. 497, 234 P. 388, 394:

"The fact that the inclusion of [property in a particular zone] depreciates its value is not of controlling significance. Every exercise of the police power is apt to affect adversely the property interest of somebody."

To the same effect, see De Lano v. City of Tulsa, supra; Marblehead Land Co. v. City of Los Angeles, supra.

■ A detailed recital or consideration of the evidence would seem to serve no useful purpose. Appellant owns residential property in a residential district which it is forbidden to use for commercial purposes. The district is predominately residential. If the ordinance bears a rational relationship to the public health and public safety of the community, it must be upheld. That it bears such relation seems fairly clear from the trend of modern authority. Thus, in Euclid, Ohio, v. Ambler Realty Co., supra, it is said:

"* * * The exclusion of buildings devoted to business, trade, etc., from residential districts, bears a rational relation to the health and safety of the community. Some of the grounds for this conclusion are promotion of the health and security from injury of children and others by separating dwelling houses from territory devoted to trade and industry; suppression and prevention of disorder; facilitating the extinguishment of fires, and the enforcement of street traffic regulations and other general welfare ordinances; aiding the health and safety of the community, by excluding from residential areas the confusion and danger of fire, contagion, and disorder, which in greater or less degree attach to the location of stores, shops, and factories. Another ground is that the construction and repair of streets may be rendered easier and less expensive, by confining the greater part of the heavy traffic to the streets where business is carried on."

■ With the wisdom or expediency of the ordinance we are not concerned. If it is within the legislative power of the city, all presumptions must be indulged in favor of its validity. It cannot be said that this particular restriction was not deemed necessary to prevent a congestion of traffic at the entrance to and possibly from Kingsbury avenue, to facilitate the enforcement of traffic regulations, if not fire regulations, and to protect the life and limb of pedestrians in the vicinity from hazard arising from that great flow and rush of wheel traffic following the development of the area as a commercial district. Such considerations may well have caused the governing body of the city to adopt the amending ordinance, and they seem sufficiently cogent to preclude us from saying, "that such provisions are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare." Euclid, Ohio, v. Ambler Realty Co., supra.

The teaching of Washington ex rel. Seattle Title Trust Co. v. Roberge, 278 U. S. 116, 49 S.Ct. 50, 73 L.Ed. 210, 86 A.L. R. 654, is not inconsistent with the views herein expressed. In that case the court held that there had been an improper delegation of power to owners of adjoining property to consent to the proposed use, or disallow it. This delegation of power was held to be repugnant to the due process clause of the Fourteenth Amendment.

In Nectow v. Cambridge, 277 U.S. 183, 48 S.Ct. 447, 72 L.Ed. 842, urged by appellant as sustaining its contention, the master and the court found that the health, safety, convenience, and general welfare of the inhabitants of the part of the city affected would not be promoted by the disposition made by the ordinance of the locus in question. In that case, the property was located in a district primarily commercial and industrial, and its inclusion in a residential district, precluding its use for purposes other than residential, was clearly arbitrary under the facts and circumstances disclosed in that case.

Great reliance is placed upon the decision of this court in Women's Kansas City St. Andrew Society v. Kansas City,

Mo., supra. In that case it was proposed to devote a residence property to the philanthropic purpose of providing a home for twelve aged and indigent women. In outward appearances it would not be distinguishable from the residences in the residential district in which it was located. Judge Kenyon, speaking for this court, quoting from Village of University Heights v. Cleveland Jewish Orphans' Home (C.C.A.6) 20 F.(2d) 743, 54 A.L.R. 1008, said that the police power had been held to include "the right generally to exclude business houses, stores, shops, and apartment houses from strictly residential districts."

The fact that near appellant's property is a zone in which a use is permitted which is prohibited to appellant's property is not fatal to the validity of the ordinance. American Wood Products Co. v. City of Minneapolis, supra; Feraut v. City of Sacramento, 204 Cal. 687, 269 P. 537; Biscay v. City of Burlingame, 127 Cal. 213, 15 P. (2d) 784.

In determining what is reasonable, much must depend upon the requirements of the locality, and what would be reasonable one place might well be unreasonable in another. The ordinance here in question relates to a matter which is within the legislative power of the city, and hence all presumptions are in favor of its validity, and we cannot say that the reasonableness of this ordinance, excluding appellant's property from commercial use, is not a fairly debatable one. While appellant might have had some ground to complain, the basis of that complaint appears to have been removed by the adoption of Ordinance No. 39,398, which extends the residential district so as to include all lots in Washington Heights from the north boundary of appellant's lot to the industrial district, and by the adoption of Ordinances Nos. 38,758 and 39,398, by the provisions of which the residence district has been extended so as to include all the lots in Washington Heights between the multiple dwelling district in the south end thereof and the industrial district in the north end thereof, except two lots on Skinker boulevard immediately north of the multiple dwelling district, which are occupied by stores and a gasoline filling station. The lower court held in effect that it was not plain or palpable that the restrictions placed upon the use of appellant's property

had no real or substantial relation to the public safety, morals, or general welfare. In this view, we concur.

The judgment appealed from is therefore affirmed.