**MERCED DREDGING CO. v. MERCED COUNTY et al.**

No. 378.

District Court, S. D. California, N. D.
June 29, 1946.

602

Robert M. Searls, of San Francisco, and C. Ray Robinson, of Merced, Cal., for plaintiff.

Claude H. Adams, Dist. Atty., and William R. Elam, Deputy Dist. Atty., both of Merced, Cal., and Walter H. Stammer, of Fresno, Cal., for defendants.

MATHES, District Judge.

Plaintiff Merced Dredging Company, a Nevada corporation authorized to engage in business in California, has filed in this court a bill of complaint against the county of Merced, California, and the legislative and governing body of the county—the Board of Supervisors—for a preliminary and final injunction staying enforcement of Ordinance No. 253, adopted by the supervisors as "an urgency [measure] necessary for the immediate preservation of the public peace, health or safety * * *" to take effect immediately. Cal.Const., Art. IV, § 1.

Numerous affidavits have been filed, both in support of, and in opposition to plaintiff's application for a preliminary injunction. Defendants have also submitted a motion to dismiss the bill.

According to the complaint: Since 1935 plaintiff has·been engaged in the business of mining gold in the county of Merced on and adjacent to the Merced River, in an area located approximately one mile south of the town of Snelling in said county. Plaintiff's operations consist of mining by use of a power dredge the surface and subsurface gravel channel of the Merced River, including various old channels through which the river flowed in geological ages from the Pleistocene to recent periods. The gravel channel contains placer gold deposits which cannot be mined profitably otherwise than by means of the dredging process. This operation reaches to a depth of approximately twenty feet below the pond level.

The surface of the land so mined is flat valley land adjacent to the present channel, which has in part been overlain by sediments deposited by the river in its meanderings through long periods of time.

Plaintiff owns in fee 840 acres of this land, of which 265 acres have already been dredged. The total area covered by plaintiff's presently-completed and future-intended dredging operations is 680 acres, of which only 415 acres remain to be dredged, and 86 acres are yet to be acquired. Plaintiff estimates that approximately 4½ years will be required in which to dredge all the

material which is known to contain pay values within this area.

Approximately one-third of this land is suitable for alfalfa crops, one-third for grazing, and the remainder is swamp and overflow with timber and brush, which may be classed as poor grazing land. The total remaining acreage intended to be dredged by plaintiff is approximately one-twentieth of one per cent of the total arable lands within the county. The total area of land in the county of Merced which has any known dredging value does not exceed 2,000 acres, a considerable portion of which is not fit for cultivation in its natural state due to its overflow and swampy character. This 2,000 acres is approximately one-fourth of one per cent of the county's total of 873,949 acres of arable land as shown by the 1940 United States census.

Plaintiff's operations on these lands to date, involving acquisition and prospecting and the erection of dredging machinery and equipment and appurtenant structures thereon, have entailed capital expenditures in excess of $380,000. It is a profitable business, the land dredged to date having yielded $2,701,089.73 in gold, silver and platinum.

On September 1, 1945, the defendant Board of Supervisors met and adopted Ordinance No. 253. By its terms this ordinance prohibits all persons from carrying on any "surface mining operations in the county of Merced * * * involving the use of dredgers, drag lines, or other soil moving devices which displace rocks and soil, or both, on the earth's surface [§ 2] * * * without first having obtained a permit so to do, as herein provided." [§ 9.]

Each application for a permit must be accompanied by a "permit fee of $10," and a bond in the penal sum of $300 for each acre covered by the application, a maximum of $10,000, "conditioned to pay all damages to said county and any other person or persons who may be damaged by reason of the mining operations." [§ 9.]

All such operations "shall be conducted in such manner as to replace the rocks and soil displaced by their operations. The coarse material shall be placed at the bottom of the excavation, the fine material at the top, and the top soil shall be replaced on top of the other material. The surface of the land, after dredging, shall be left in as level a condition as it was before any of the said materials were displaced." [§ 2.]

"Any violation * * * is a misdemeanor * * * punishable by a fine not to exceed * * * $500.00, or by imprisonment * * * for not to exceed six months, or by both * * *. For each day that any person fails to comply * * * he shall be guilty of a separate violation thereof." [§ 11.]

"Without in any manner affecting the penal provisions * * * the Board of Supervisors * * * reserve the right * * * to terminate any permit to mine * * * for any violation of this ordinance, after granting a hearing on the question of violation * * *." [§ 10.]

Plaintiff alleges that its future dredging operations will not approach closer than one mile to the nearest residence community or state highway, and will not involve any injury, hazard, or nuisance to adjacent property, or to the people residing in the county, or to the public traveling on the highways, or any injury or threat of injury to public morals, health, safety, or welfare.

It is urged that the effect of ordinance No. 253 is to deprive plaintiff of property without due process of law, and to deny to plaintiff the equal protection of the laws, in contravention of the Fourteenth Amendment to the Federal Constitution; also that enforcement of the ordinance would amount to a taking of private property for public use, without just compensation, contrary to the Fifth Amendment.

The complaint alleges that defendants threaten to enforce the questioned ordinance as against plaintiff, and to cause the arrest and imprisonment of plaintiff's employees and so prevent plaintiff's further dredging operations on its own land, unless plaintiff complies with the provisions of the ordinance. And further that the immediate damage thus threatened to plaintiff's property and property rights is irreparable because plaintiff's remedy at law as against defendants is inadequate. The

complaint concludes with an offer "to do equity herein as the Court may determine."

Plaintiff invokes the jurisdiction of this court under § 24 of the Judicial Code upon the ground that "the matter in controversy exceeds * * * $3,000, and (a) arises under the Constitution * * * of the United States * * * or (b) is between citizens of different States" 28 U.S.C.A. § 41(1) (a), (b).

■ Since plaintiff is a Nevada corporation and defendant county of Merced is a "citizen" of California within the meaning of Article III, § 2, (U.S.Const.), requisite diversity of citizenship exists. Cowles v. Mercer County, 1868, 74 U.S. 118, 122, 7 Wall. 118, 19 L.Ed. 86; Pettibone v. Cook County, 8 Cir., 1941, 120 F.2d 850, 851.

■ It is equally well settled that a corporation is a "person" within the meaning of the due process and equal protection clauses of the Fourteenth Amendment. Santa Clara County v. Southern Pac. R. R. Co., 1885, 118 U.S. 394, 396, 6 S.Ct. 1132, 30 L.Ed. 118; Covington and Lexington Turnpike Road Co. v. Sandford, 1896, 164 U.S. 578, 592, 17 S.Ct. 198, 41 L.Ed. 560; Liggett Co. v. Baldridge, 1928, 278 U.S. 105, 111, 49 S.Ct. 57, 73 L.Ed. 204. And a foreign corporation permitted, as plaintiff here, to do business within a state may not be subjected to unconstitutional state action. Kentucky Finance Corp. v. Paramount Auto Exchange Corp., 1923, 262 U. S. 544, 550, 43 S.Ct. 636, 67 L.Ed. 1112; Power Mfg. Co. v. Saunders, 1927, 274 U. S. 490, 493, 47 S.Ct. 678, 71 L.Ed. 1165.

■ Moreover, plaintiff's business is a property right, and as such is entitled to protection against the exercise of state power in contravention of the Federal Constitution. Duplex Printing Press Co. v. Deering, 1921, 254 U.S. 443, 465, 41 S.Ct. 172, 65 L.Ed. 349, 16 A.L.R. 196; Truax v. Corrigan, 1921, 257 U.S. 312, 327, 42 S.Ct. 124, 66 L.Ed. 254, 27 A.L.R. 375; Liggett Co. v. Baldridge, supra, 278 U.S. at page 111, 49 S.Ct. 57.

■ Article XI, § 11, (Cal.Const.) declares: "Any county * * * may make and enforce within its limits all such lo- cal, police, sanitary, and other regulations as are not in conflict with general laws." Except to the extent that the legislature by general laws has preempted the field, any county in California may exercise within its territorial limits the complete police power of the state. In re Holmes, 1921, 187 Cal. 640, 203 P. 398; Stanislaus County, etc., Ass'n v. Stanislaus County, 1937, 8 Cal.2d 378, 383, 384, 65 P.2d 1305.

■ The California legislature has not sought to regulate dredge mining. Indeed, a measure similar to the questioned ordinance at bar failed of enactment in the 1945 legislature. Senate Bill 37, Senate Final History, p. 109, Final Calendar of Legislative Business, Cal. Legislature, 56th Session (1945).

So the action of the Board of Supervisors of the county of Merced is to be regarded as the action of the state. Raymond v. Chicago Union Traction Co., 1907, 207 U.S. 20, 35, 40, 28 S.Ct. 7, 52 L.Ed. 78, 12 Ann. Cas. 757; Lovell v. City of Griffin, 1938, 303 U.S. 444, 450, 58 S.Ct. 666, 82 L.Ed. 949.

■ However, a county ordinance is not deemed a "statute of a State" within the meaning of § 266 of the Judicial Code as amended (28 U.S.C.A. § 380) so as to permit a three-judge court to be convened to decide the constitutionality of the measure. Phillips v. United States, 1941, 312 U.S. 246, 251, 61 S.Ct. 480, 85 L.Ed. 800; Borges v. Loftis, 9 Cir., 1937, 87 F.2d 734.

■ Under our system it is the function of the legislative branch to exercise what are known as the police powers of the state, and thus to determine what measures are appropriate or needful for the protection of the public welfare, and especially the public health, the public safety, and the public morals. Mugler v. Kansas, 1887, 123 U.S. 623, 661, 8 S.Ct. 273, 31 L.Ed. 205; Nebbia v. People of State of New York, 1934, 291 U.S. 502, 524, 525, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469.

■ Every legislative enactment is rightly presumed to be constitutional. Unless the judicial branch is compelled to say the questioned enactment is clearly out of constitutional bounds, the expressed will

of the legislative should be given effect. Munn v. Illinois, 1876, 94 U.S. 113, 123, 24 L.Ed. 77; Sage Stores Co. v. Kansas, 1944, 323 U.S. 32, 35, 65 S.Ct. 9, 89 L.Ed. 25.

Courts will always assume that the legislative body has acted according to its honest judgment for the best interests of the state. Florida Central & P. R. Co. v. Reynolds, 1902, 183 U.S. 471, 480, 22 S.Ct. 176, 46 L.Ed. 283; Ellis v. United States, 1907, 206 U.S. 246, 256, 27 S.Ct. 600, 51 L.Ed. 1047, 11 Ann.Cas. 589; In re Smith, 1904, 143 Cal. 368, 373, 77 P. 180, 182.

When, as here, an enactment is challenged upon constitutional grounds, judicial inquiry should properly exclude questions of policy and deal solely with the single question of constitutional power—whether or not the measure was within the range of legislative power granted to the enacting body. It is for the legislative body, and not the courts, to determine "whether the enactment is wise or unwise, whether it is based on sound economic theory, whether it is the best means to achieve the desired result." Chicago B. & Q. R. R. Co. v. McGuire, 1911, 219 U.S. 549, 569, 31 S.Ct. 259, 263, 55 L.Ed. 328; Block v. Hirsh, 1921, 256 U.S. 135, 158, 41 S.Ct. 458, 65 L.Ed. 865, 16 A.L.R. 165.

In deciding the question of constitutional power, courts will assume the existence of a state of facts giving validity to the legislation, unless the evidence is to the contrary, or unless facts of common knowledge or other matters which may be judicially known and noticed compel otherwise. United States v. Carolene Products Co., 1938, 304 U.S. 144, 152–154, 58 S.Ct. 778, 82 L.Ed. 1234; Metropolitan Cas. Ins. Co. of New York v. Brownell, 1935, 294 U.S. 580, 585, 55 S.Ct. 538, 79 L.Ed. 1070.

The circumstances giving rise to the necessity for Ordinance No. 253 are set forth in § 13, the "urgency clause," which states:

"This ordinance is hereby declared to be an urgency measure, necessary for the immediate preservation of the public peace, health and safety within the meaning of Article IV, Section 1, of the Constitution of the State of California, and shall, therefore, go into effect immediately. A statement of the facts constituting such necessity is as follows:

"Surface mining operations are at this time under way within the County of Merced and it appears that additional dredgers will commence operations at once; that such mining operations now are threatening to be conducted in rich agricultural lands of the County of Merced; that such operations result in the destruction of such agricultural land and in the creation of numerous pools of stagnant water, wherein mosquitoes breed, all to the detriment of the public health and safety of the people of Merced County. Unless this ordinance becomes immediately effective, large areas of fertile agricultural land will be destroyed and additional breeding places for mosquitoes will be created."

Public health is one of the first objects calling for exercise of the police power. Dobbins v. City of Los Angeles, 1904, 195 U.S. 223, 235, 236, 25 S.Ct. 18, 49 L.Ed. 169. Section 6 of the ordinance states:

"Impounded water in open pools or lakes in land upon which surface mining operations have been conducted and left there by failure to relevel and resoil such lands is a breeding place for mosquitoes. The disease of malaria is known to be transmitted by mosquitoes which are common in said county. The existence in said county of malaria and of any condition of property increasing or tending to increase in number or to initiate cases of malaria is a known danger in fact of great magnitude to the public health, safety and welfare of the people of said county. Many men and women who have served in the armed forces of the United States in the Pacific area in the recent war between the United States and Japan will return home infected with malaria contracted by them in the tropics, thus creating a widespread source from which said disease may be transmitted. There is great and imminent danger thus resulting to the public health, safety and welfare of the people of said county from the existence of such open pools of water which serve as breeding places for mosquitoes."

But an affidavit of the Field Superintendent for the Merced Mosquito Abatement District filed on behalf of defendants declares that "the anopheles mosquito * * * is the only type that transmits malaria * * * it is in fresh water that the anopheles or malaria type mosquito breeds * * * the water must be fresh, clean, clear, cool and slightly moving * * * the anopheles or malaria type mosquito never breeds in stagnant or foul water * * * the aedes type of mosquito, which is the pest variety, does breed in stagnant or foul water."

This affidavit further shows "that a general mosquito abatement policy along the Merced River in said Merced County * * * has been formulated in that in the year 1945 there was added to the Merced Mosquito Abatement District all the remaining lands in said Merced County, including lands of the plaintiff * * * which until this year were not included in said Merced Mosquito Abatement District; that the present area of said Merced Mosquito Abatement District is coextensive with the boundary lines of said Merced County and that in 1945 all lands in said Merced County were taxed for the benefit of said Merced Mosquito Abatement District * * *."

■ The constitutional guaranty of due process contained in the Fifth Amendment, as respects federal activity, and in the Fourteenth, as respects state action, requires "that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the object sought to be attained." Nebbia v. New York, supra, 291 U.S. at pages 524, 525, 54 S.Ct. at page 511.

■ If protection of the public from malaria is the public health object sought to be attained by the ordinance at bar, one would be hard put to say that the means selected bear any real or substantial relation to that object. Cf. Belmont v. New England Brick Co., 1906, 190 Mass. 442, 77 N.E. 504, 506. Resoiling as required by the ordinance—the refilling of the dredged excavation by replacing the displaced rocks and soil in the same order as removed—would seem to be a decidedly arbitrary means of accomplishing ineffectively what could be effectively accomplished by employment of known and accepted scientific methods of mosquito eradication and control such as drainage, the use of oils and larvicides, mosquito fish, etc. See: Herms & Gray, Mosquito Control (1940), pages 111, 165, 221; Hardenburg, Mosquito Eradication (1922), pages 99, 158, 172.

Moreover, there was no necessity for the resoiling requirement of the ordinance as a mosquito control or abatement measure. Merced County has an active Mosquito Abatement District organized under state law. Stats.1915, p. 1011, as amended, Deering's General Laws, 1937, Act 3701. This district embraces all land within Merced County, including of course the land on which plaintiff's operations are conducted. Taxes are regularly assessed for the support of the district, and the governing body of the district has the power "to take all necessary or proper steps for the extermination of mosquitoes, flies or other insects within the district, and * * * to abate as nuisances all stagnant pools of water and other breeding places for mosquitoes, flies or other insects within the district * * *." Mosquito Abatement District Law, supra, § 6, Stats. 1915, p. 1011.

■ Section 7 suggests that one purpose of the ordinance was to prevent pollution of domestic water supply. The section states: "In mining operations conducted with dredgers, drag lines, or other soil moving devices, the fine materials are washed and carried, as sediment, into the pit in which such operations are conducted. Water laden with such sediment runs, or seeps, or percolates, into the surface and underground water courses, and contaminates them and the water flowing therein for great distances from the source of such contamination, causing them to be muddy and impure. In Merced County domestic water is customarily obtained from the streams or from wells."

Assuming as facts the statements in § 7 as to water pollution—which numerous affidavits filed on behalf of plaintiff deny—

it is difficult indeed to conjure up any real or substantial relation between the evil claimed and the remedy adopted. Common sense would seem to be aligned with the view that if dredge mining contaminates even temporarily the underground water courses "causing them to be muddy and impure" the resoiling process required by the ordinance would, a fortiori, immediately aggravate and multiply that condition.

The old common-law maxim *sic utere tuo ut alienum non laedas,* that every person so use his own property as not to injure that of another, vouchsafes the constitutionality of any reasonable regulation to prevent pollution of a water supply in which others and perhaps the entire community possess an interest. Ohio Oil Co. v. Indiana, 1900, 177 U.S. 190, 20 S.Ct. 576, 44 L.Ed. 729; Bandini Petroleum Co. v. Superior Court, 1931, 284 U.S. 8, 52 S.Ct. 103, 76 L.Ed. 136, 78 A.L.R. 826; Champlin Refining Co. v. Corporation Commission, 1932, 286 U.S. 210, 52 S.Ct. 559, 76 L.Ed. 1062, 86 A.L.R. 403.

But if plaintiff's operations pollute domestic water supply, it was not necessary for the defendant Board of Supervisors to legislate a remedy. Existing state law long antedating the ordinance affords ample remedies to which resort may be had to prevent any operation, dredge mining or otherwise, which "fouls or pollutes the waters of any * * * stream * * *." Yuba County v. Kate Hayes Mining Co., 1903, 141 Cal. 360, 74 P. 1049; Yolo County v. City of Sacramento, 1868, 36 Cal. 193; Cal.Civ.Code, §§ 3479–3503, Cal.Code Civ.Proc. §§ 731–735, Cal.Penal Code, §§ 370–374.

Section 8 of the ordinance states:

"Merced County is rich in historic lore and its streams constitute a scenic attraction for its citizens and other persons traveling in the county * * *. Dredging of lands causes the displacement of large quantities of soil and rocks and destroys the scenic, historic * * * value of the land and of the area in which said dredging operations are carried on."

Considerations of public welfare involved in the preservation of the scenic beauty or the historical aspects of private property are not such as to give constitutional warrant to legislative interference with otherwise lawful use by an owner. The police power of the state may not be invoked to satisfy a mere public wish or desire, or demands founded upon aesthetic or sentimental considerations, but only to protect essential public interests. Welch v. Swasey, 1909, 214 U.S. 91, 107, 29 S.Ct. 567, 53 L.Ed. 923; St. Louis Poster Adv. Co. v. City of St. Louis, 1919, 249 U.S. 269, 274, 39 S.Ct. 274, 63 L.Ed. 599; Varney & Green v. Williams, 1909, 155 Cal. 318, 100 P. 867, 21 L.R.A.,N.S., 741, 132 Am. St.Rep. 88; Abbey Land & Improvement Co. v. San Mateo County, 1914, 167 Cal. 434, 438, 139 P. 1068, 1070, 52 L.R.A.,N.S., 408, Ann.Cas.1915C, 804.

If the public desires to preserve the scenic or historical features of privately-owned land, the power of eminent domain is available to satisfy the public desire, and the constitutional requirement of just compensation secures the private interests of the owner. Cal.Const., Art. I, § 14; Hairston v. Danville & Western R. Co., 1908, 208 U.S. 598, 606, 607, 28 S.Ct. 331, 52 L.Ed. 637, 13 Ann.Cas. 1008.

Section 8 further declares that "The failure to replace the materials displaced by dredging operations, unless exempted therefrom as in this ordinance provided, when such failure results in the leaving of piles and mounds of rocks and other coarse material in the scenic, historic or agricultural areas * * * is a public nuisance * * *."

But here again, if the legislative findings can be sustained, the long-established remedies provided by California law for abatement of nuisances would afford all necessary relief. Carter v. Chotiner, 1930, 210 Cal. 288, 291 P. 577.

Legislative findings of nuisance, while persuasive, are not determinative of the validity of the ordinance. Euclid v. Ambler Co., 1926, 272 U.S. 365, 387, 388, 47 S.Ct. 114, 71 L.Ed. 303, 54 A.L.R. 1016; Jones v. City of Los Angeles, 1931, 211 Cal. 304, 295 P. 14, 15, 19.

Threatened destruction of "rich agricultural lands of the county of Merced" through dredging is stated in the urgency

clause as a ground for the regulation. Concededly the resoiling required by the ordinance is reasonably adapted to accomplish the stated object—to preserve the agricultural value of the land. There remains the question whether preservation of the fertility of privately-owned land is within the present-day scope of the police power of the state.

Unquestionably the object is a laudable one. It must be conceded today that preservation of the fertility of our soil serves both the present and the future public welfare.

Recognizing the importance of this long-range public interest, Congress in 1935 enacted the Soil Conservation and Domestic Allotment Act, 49 Stat. 163, 16 U.S.C.A. § 590a, which sets up a comprehensive plan for soil conservation, including "preservation and improvement of soil fertility," and provides for federal financing with grants in aid to the states. Under this Act the individual landowner is compensated for his efforts in "soil restoration, soil conservation, or the prevention of erosion." 16 U.S.C.A. § 590 h(b) (1); Mayo v. United States, 1943, 319 U.S. 441, 443, 63 S.Ct. 1137, 87 L.Ed. 1504, 147 A.L.R. 761; Baboquivari Cattle Co. v. Commissioner of Internal Revenue, 9 Cir., 1943, 135 F.2d 114.

Admitting public desire for and benefit from protection of fertility of land from destruction, the top soil on plaintiff's land is owned by plaintiff, and plaintiff claims that title to be sole and absolute. There is here no common right of many owners to be protected, which served as constitutional warrant for regulation in Ohio Oil Co. v. Indiana, supra, 177 U.S. at page 190, 20 S.Ct. 576; Walls v. Midland Carbon Co., 1920, 254 U.S. 300, 41 S.Ct. 118, 65 L.Ed. 276; Lindsley v. Natural Carbonic Gas Co., 1911, 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369, Ann.Cas.1912c, 160; Bandini Petroleum Co. v. Superior Court, supra, 284 U.S. at page 22, 52 S.Ct. 103; Champlin Refining Co. v. Corporation Commission, supra, 286 U.S. at page 210, 52 S.Ct. 559.

Nor does it appear that dredge mining creates a condition on plaintiff's land likely to cause public damage or damage to adjoining landowners. Manifestly destruction by dredging of the fertility of plaintiff's soil does not affect the fertility of other land. Cf. Plymouth Coal Co. v. Commonwealth of Pennsylvania, 1914, 232 U.S. 531, 34 S.Ct. 359, 58 L.Ed. 713; Perley v. State of North Carolina, 1919, 249 U.S. 510, 39 S.Ct. 357, 63 L.Ed. 735.

 Mining is a lawful business. Public policy in California has always fostered it. Since prior to statehood, mining—especially for gold—has been economically and romantically associated with the history of California. Conger v. Weaver, 1856, 6 Cal. 548, 65 Am.Dec. 528; Dutch Flat Water Co. v. Mooney, 1859, 12 Cal. 534; Henshaw v. Clark, 1859, 14 Cal. 460, 464, 465; Boggs v. Merced Mining Co., 14 Cal. 279, 376–379; Merced Mining Co. v. Boggs, 1866, 3 Wall. 304, 18 L.Ed. 245.

If the ordinance in question prohibited plaintiff entirely from carrying on its business, it would be clear that the bounds of reason had been exceeded—that the legislative branch had arbitrarily gone beyond "the necessities of the case." Hadacheck v. Los Angeles, 1915, 239 U.S. 394, 412, 36 S.Ct. 143, 60 L.Ed. 348, Ann.Cas.1917B, 927; cf: Reinman v. Little Rock, 1915, 237 U.S. 171, 35 S.Ct. 511, 59 L.Ed. 900; Nectow v. Cambridge, 1927, 277 U.S. 183, 188, 48 S.Ct. 447, 72 L.Ed. 842; In re Kelso, 1905, 147 Cal. 609, 82 P. 241, 242, 2 L.R.A., N.S., 796, 109 Am.St.Rep. 178; People v. Hawley, 1929, 207 Cal. 395, 279 P. 136, 144. This would be so because the nature of plaintiff's business is such that the public interest can be fully protected by regulation. Cf. Laurel Hill Cemetery v. San Francisco, 1910, 216 U.S. 358, 364, 365, 30 S.Ct. 301, 54 L.Ed. 515.

But here the legislative power seeks only to regulate—to prevent destruction of the top soil which gives fertility to the land.

The problem for decision is whether the circumstances are such that the Constitution requires the public to compensate the private owner to the extent that the regulation cuts down the value of the owner's property rights.

As Mr. Justice Holmes put it, in Pennsylvania Coal Co. v. Mahon, 1922, 260 U.S.

393, 413, 415, 416, 43 S.Ct. 158, 159, 67 L. Ed. 322, 28 A.L.R. 1321:

"Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. * * *

"The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. A similar assumption is made in the decisions upon the Fourteenth Amendment. * * * When this seemingly absolute protection is found to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States. * * *

"We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

█ It is often a close question whether and, if so, how far the police power may be applied to regulate the operations of a property owner without making compensation. Two variable factors are to be considered: First, the extent of the public interest to be protected and, second, the extent of the regulation essential to protect that interest. Block v. Hirsh, supra, 256 U.S. at pages 155, 156, 41 S.Ct. 458; Levy Leasing Co. v. Siegel, 1922, 258 U.S. 242, 247, 42 S.Ct. 289, 66 L.Ed. 595; Pennsylvania Coal Co. v. Mahon, supra, 260 U.S. at pages 413, 417–422, 43 S.Ct. 158; Pumpelly v. Green Bay Company, 1871, 80 U.S. 166, 13 Wall. 166, 20 L.Ed. 557; Marblehead Land Co. v. City of Los Angeles, 9 Cir., 1931, 47 F.2d 528.

█ It may be said in a given case that due process permits regulation to such extent as is necessary to protect the essential public interest involved. Cf. Erie R. R. Co. v. Board, 1920, 254 U.S. 394, 410, 411, 41 S.Ct. 169, 65 L.Ed. 322; Welch v. Swasey, supra, 214 U.S. 91, 29 S.Ct. 567, 53 L.Ed. 923; Panhandle Eastern Pipe Line Co. v. Highway Commission, 1935, 294 U.S. 613, 55 S.Ct. 563, 79 L.Ed. 1090; Nectow v. Cambridge, supra, 277 U.S. at page 188, 48 S.Ct. 447.

The first consideration then is the extent of the imperative public interest to be protected through the resoiling process required by the ordinance.

The evidence is that all the land in Merced County which has any known dredging value does not exceed 2000 acres, a considerable portion of which is swamp land not fit for cultivation in its natural state; which 2000 acres is less than one-fourth of one per cent of the county's total arable land as shown by the 1940 census.

Assuming that dredge-mining will destroy entirely and forever the entire fertility of the soil mined, plaintiff urges that the picture—although unsightly—is not one of compelling public concern when the total arable acreage of the fertile county of Merced is kept in mind.

Conditions of food supply and population can be readily envisioned which would render the public interest in preservation of soil fertility urgent and immediately paramount. But our problem, until recently at least, has been to deal with the surpluses produced from the vast acreage of our arable land. And where state police power has been exercised with respect to subjects touching fertility of the soil, it has been exerted to protect landowners and the public from the economic consequences of excess production. Parker v. Brown, 1943, 317 U.S. 341 355, 63 S.Ct. 307, 87 L.Ed. 315; Agricultural Prorate Commission v. Superior Court, 1936, 5 Cal.2d 550, 55 P.2d 495; cf. Wickard v. Filburn, 1942, 317 U.S. 111, 115, 63 S.Ct. 82, 87 L.Ed. 122; Edwards v. United States, 9 Cir., 1937, 91 F.2d 767.

However, in the language of Euclid v. Ambler Co., supra, 272 U.S. at pages 386, 387, 47 S.Ct. at page 118, "problems have developed, and constantly are developing, which require, and will continue to require, additional restrictions in respect of the use and occupation of private lands * * *. Regulations, the wisdom, necessity and validity of which, as applied to existing conditions, are so apparent that they are now

uniformly sustained, a century ago, or even half a century ago, probably would have been rejected as arbitrary and oppressive. * * * And in this there is no inconsistency for, while the meaning of constitutional guaranties never varies, the scope of their application must expand or contract to meet the new and different conditions which are constantly coming within the field of their operation. In a changing world it is impossible that it should be otherwise."

■ The evidence discloses that the average assessed value of the land prior to acquisition for dredging purposes is approximately $60 per acre, and that by plaintiff's operations the assessed value of such land is increased seven fold, due to its mineral content for the year in which dredged. This means of course that during the year when dredged, a given parcel of land will return in taxes the equivalent of seven normal years prior to dredging.

But if, as appears undisputed, mining by dredgers as now practiced leaves once fertile soil barren, once arable land waste, for myriad generations to come, then the county stands to lose ten times seven years and more of normal taxes unless the dredged land be resoiled. So considered, the public stake in preventing destruction of the top soil on privately-owned land is both substantial and immediate. Chicago B. & Q. Railway v. State of Illinois ex rel. Drainage Commissioners, 1906, 200 U.S. 561, 585, 26 S.Ct. 341, 50 L.Ed. 596, 4 Ann.Cas. 1175.

■ Tax considerations aside, the public interest declared by the legislative branch must be given recognition unless the courts are compelled to hold it clearly beyond reason. Sage Stores Co. v. Kansas, supra, 323 U.S. at page 35, 65 S.Ct. 9; Broadnax v. State of Missouri, 1911, 219 U.S. 285, 292, 293, 31 S.Ct. 238, 55 L.Ed 219.

Within the realm of the debatable, within the field where reasonable men may differ, the legislative will reigns—the representatives of the majority may have their way. Williams v. Mayor, 1933, 289 U.S. 36, 42, 53 S.Ct. 431, 77 L.Ed. 1015.

Considering population increases and other relevant factors of common notice today, the judicial branch would be presumptuous to say that a legislative body is clearly unreasonable in declaring the extent of public interest in the fertility of the soil to be such as to require that one who removes top soil for mining purposes should be compelled to preserve and replace it to serve the long-range food needs of posterity. Lawton v. Steele, 1894, 152 U.S. 133, 139, 14 S.Ct. 499, 38 L.Ed. 385.

I will not presume to hold—at least not from the evidence upon this summary hearing—that it is clear the defendants were outside the bounds of reason, and hence outside constitutional bounds, in enacting Ordinance No. 253 upon the assumption that the public welfare requires preservation of the top soil on plaintiff's lands and other lands which may be dredged in Merced County. Euclid v. Ambler Co., supra, 272 U.S. at page 395, 47 S.Ct. 114.

The Fourteenth Amendment does not forbid statutory changes "to have a beginning, and thus to discriminate between the rights of an earlier and later time." Sperry & Hutchinson Co. v. Rhodes, 1911, 220 U.S. 502, 505, 31 S.Ct. 490, 55 L.Ed. 561.

■ Assuming as constitutional the purpose of the ordinance, there remains the question as to the constitutionality of the means adopted to achieve that purpose.

The ordinance does not prescribe any standard to which applicants for permits shall conform. Nor does the enactment state the circumstances under which an applicant will be entitled to a permit. Cf. Gundling v. City of Chicago, 1900, 177 U. S. 183, 20 S.Ct. 633, 44 L.Ed. 725.

There is indeed no requirement in the ordinance that any permit be granted under any circumstances. cf. Yick Wo v. Hopkins, 1886, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220; Parker v. Colburn, 1925, 196 Cal. 169, 178, 236 P. 921, 924, 925.

However, since all applications are to be passed upon by the legislative body itself, the court will assume until the contrary appears that the power granted by the ordinance will not be arbitrarily ex-

ercised. People of State of New York ex rel. Lieberman v. Van de Carr, 1905, 199 U.S. 552, 562, 26 S.Ct. 144, 50 L.Ed. 305; Plymouth Coal Co. v. Commonwealth of Pennsylvania, supra, 232 U.S. at page 545, 34 S.Ct. 359; Gundling v. Chicago, supra, 177 U.S. at page 187, 20 S.Ct. 633.

Defendants assert that it is physically possible and economically practicable for plaintiff and other dredge miners to restore the surface of dredged ground in as level a condition as it was before displacement, placing the course material at the bottom, followed by the fine material and the top soil. Plaintiff denies that it is physically possible to resoil as required by the ordinance and asserts that the cost would be confiscatory—$1,127 an acre. The evidence shows that plaintiff's gross income from gold produced through dredge mining averages $3,250 an acre.

■ If the resoiling required by the ordinance be a valid exercise of police power, plaintiff cannot avoid it by the excuse that compliance would greatly diminish profits or even result in bankruptcy. Federal Power Commission v. Hope Gas Co., 1944, 320 U.S. 591, 601, 64 S.Ct. 281, 38 L.Ed. 333; Lehigh Valley R. R. v. Board of Public Utility Commissioners, 1928, 278 U.S. 24, 34, 49 S.Ct. 69, 73 L.Ed. 161, 62 A.L.R. 805; In re Kelso, supra, 147 Cal. 609, 82 P. 241, 242. That the legislative representatives of the people "might be so foolish as to kill a goose that lays golden eggs for them, has no bearing on their constitutional rights. * * * Intelligent self-interest should lead to a careful consideration of what [plaintiff] is able to do without ruin, but this is not a constitutional duty." Erie R. R. Co. v. Board, supra, 254 U.S. at pages 410, 411, 41 S.Ct. at page 171.

■ It is not a judicial function to question whether the means adopted by legislative authority are the wisest, or whether the cost may be more than the worth. Chicago, Burlington & Quincy R. R. Co. v. McGuire, supra, 219 U.S. at page 569, 31 S.Ct. 259; Block v. Hirsh, supra, 256 U.S. at page 158, 41 S.Ct. 458.

What must concern the courts is whether the means adopted exceed the necessities of the situation to such an extent as to be arbitrary and unreasonably oppressive. Lawton v. Steele, supra, 152 U.S. at pages 136–138, 14 S.Ct. 499; Seattle Title Trust Co. v. Roberge, 1928, 278 U.S. 116, 120, 121, 49 S.Ct. 50, 73 L.Ed. 210.

■ The absolute mandate of § 2 of the ordinance, that "the surface of the land, after dredging, shall be left in as level a condition as it was before * * *," greatly exceeds the necessities of the situation. Compliance may well prove to be impracticable if not impossible, as plaintiff asserts. Requirement that resoiling be so accomplished as to leave the surface of the replaced soil as level as reasonably possible would appear to meet every valid purpose of the ordinance.

The language of § 2 is plain. It is doubtful whether the provisions are open to two possible interpretations which would permit the court a choice between the absolute requirement stated and a reasonable one. National Labor Relations Board v. Jones & Laughlin Steel Corp., 1936, 301 U.S. 1, 30, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352.

Compliance with the prohibition of § 4 against permitting more than five acres "to remain unleveled and without the top soil replaced thereon at any time" likewise seems impracticable if not impossible. Plaintiff's affidavits assert that "a dredger moves back and forth across an area being dredged in what are termed 'cuts,' and if the dredged material were replaced in making a cut in one direction so as to observe the 5-acre limitation, then when the dredger made the back cut much of this replaced material would slide into the pond and have to be dredged out all over again."

The fact that plaintiff dredges an average of almost two and one-half acres each week gives apparent validity to the prediction of one of plaintiff's dredging experts that any attempt to replace dredged material at a rate to meet the five-acre requirement of § 4 would prevent restoration of the surface to "anything like its former level" because of variation in depth to bedrock and natural swell of the dredged material.

Defendants have been unable to point to any substantial relation between the five-acre prohibition of § 4 and achievement of the constitutional objectives of the ordinance. All factors considered, every constitutional purpose of the ordinance would appear well served by plaintiff's resoiling of its own land at any rate that best suits the circumstances of plaintiff's operations. From the evidence at hand, I find that this prohibition far exceeds any necessity of the situation and is arbitrary and unreasonably oppressive.

So with the requirement of § 9 for an indemnity bond "conditioned to pay all damages to said county and any other person or persons who may be damaged by reason of the mining operation. * * *" A bond for faithful performance would satisfy every reasonable need of the occasion. Treigle v. Acme Homestead Ass'n, 1936, 297 U.S. 189, 197, 56 S.Ct. 408, 80 L.Ed. 575, 101 A.L.R. 1284; cf. Packard v. Banton, 1924, 264 U.S. 140, 44 S.Ct. 257, 68 L. Ed. 596.

It may appear otherwise after a trial of the issues here placed in controversy by the affidavits, but my interlocutory findings must be that the releveling requirement of § 2, the five-acre prohibition of § 4, and the indemnity bond requirement of § 9, bear no reasonable relation to any constitutional objective of the ordinance.

As observed in Nebbia v. People of the State of New York, supra, 291 U.S. at page 525, 54 S.Ct. at page 511, "a regulation valid for one sort of business, or in given circumstances, may be invalid for another sort, or for the same business under other circumstances, because the reasonableness of each regulation depends upon the relevant facts."

■■■ Plaintiff next attacks the validity of the requirement in § 9 that the owner of land intended to be dredged indorse his approval upon the application for a permit. This requirement is a reasonable one for protection of the property owner, and guards the defendant Board of Supervisors against the necessity of determining the scope of leases purporting to grant the right to dredge another's land. The section does not attempt a delegation of power to neighboring property owners either to

compel or to veto a given use of land other than their own, such as was condemned in Eubank v. City of Richmond, 1912, 226 U.S. 137, 143, 144, 33 S.Ct. 76, 57 L.Ed. 156, 42 L.R.A.,N.S., 1123; and Seattle Title Trust Co. v. Roberge, supra, 278 U.S. at page 122, 49 S.Ct. 50. cf. Cusack v. Chicago, 1916, 242 U.S. 526, 531, 37 S.Ct. 190, 61 L.Ed. 472, L.R.A.1918A, 136, Ann.Cas. 1917C, 594; Currin v. Wallace, 1939, 306 U.S. 1, 15, 16, 59 S.Ct. 379, 83 L.Ed. 441.

■■■ It is further urged that the limitation of each dredge-mining permit to one year, as provided in § 9, is unreasonable. The annual permit is a long-established feature of regulatory and revenue measures. People of State of New York ex rel. Lieberman v. Van de Carr, supra, 199 U.S. at page 562, 26 S.Ct. 144. Presumably a new permit will be issued annually, upon application of those miners who comply with the provisions of the ordinance. The court will assume, until the contrary is clearly shown, that the Board of Supervisors will not act arbitrarily in the administration of the ordinance. Snowden v. Hughes, 1944, 321 U.S. 1, 8, 64 S.Ct. 397, 88 L.Ed. 497; Gundling v. City of Chicago, supra, 177 U.S. at page 186, 20 S.Ct. 633; Parker v. Colburn, supra, 196 Cal. 169, 236 P. 921, 925.

■■■ Finally plaintiff asserts that the ordinance is void because it does not regulate quarries, sand and gravel pits and other forms of mine operations which destroy the surface. It was for the legislative branch to determine whether it was necessary or desirable to extend the ordinance to quarries, sand and gravel pits and others engaged in other methods of extracting minerals from the earth. Plaintiff will not be heard to complain merely because the legislative body did not exert its full power against all forms and methods of mining. Walls v. Midland Carbon Co., supra, 254 U.S. at page 324, 41 S.Ct. 118; Miller v. Wilson, 1915, 236 U.S. 373, 384, 35 S.Ct. 342, 59 L.Ed. 628, L.R.A. 1915F, 829.

■■■ It cannot be assumed that the classification is without reason. Lindsley v. Natural Carbonic Gas Co., supra, 220 U.S. at pages 78, 79, 31 S.Ct. 337. Nor is

the classification discriminatory, since the ordinance operates uniformly upon all engaged in the same business. Power Mfg. Co. v. Saunders, 1927, 274 U.S. 490, 493, 47 S.Ct. 678, 71 L.Ed. 1165; Borden's Farm Products Co. v. Baldwin, 1934, 293 U.S. 194, 209, 210, 55 S.Ct. 187, 79 L.Ed. 281; Snowden v. Hughes, supra, 321 U.S. at page 8, 64 S.Ct. 397.

■ Where, as here, the bill is based not only upon diversity of citizenship, but upon the unconstitutionality of the ordinance as violative of the Fourteenth Amendment, and plaintiff's damages from enforcement would be irreparable because no one could be compelled to respond therefor, a federal court of equity will normally enjoin enforcement if the ordinance unconstitutionally invades plaintiff's property rights. Terrace v. Thompson, 1923, 263 U.S. 197, 214, 216, 44 S.Ct. 15, 68 L.Ed. 255; Davis & Farnum Mfg. Co. v. Los Angeles, 1903, 189 U.S. 207, 218, 23 S.Ct. 498, 47 L.Ed. 778; Dobbins v. Los Angeles, supra, 195 U.S. at page 241, 25 S.Ct. 18, 49 L.Ed. 169.

■ Defendants urge, however, that plaintiff's remedy at law is adequate, and accordingly that the suit should not be sustained in this court by virtue of § 267 of the Judicial Code, 28 U.S.C.A. § 384. The state courts of California, defendants say, "afford plaintiff an adequate remedy for review of any order or act of the Board of Supervisors of Merced County pursuant to the ordinance, through mandamus or certiorari." Vincent Petroleum Corp. v. Culver City, 1941, 43 Cal.App.2d 511, 517, 111 P.2d 433. But the state remedies indicated are not adequate here. Chicago B. & Q. R. Co. v. Osborne, 1924, 265 U.S. 14, 16, 44 S.Ct. 431, 68 L.Ed. 878.

■ Moreover, even if state remedies at law were adequate, the determining factor, assuming federal jurisdiction otherwise, is whether an adequate remedy at law is afforded by the federal courts. Di Giovanni v. Camden Fire Ins. Ass'n., 1935, 296 U.S. 64, 69, 56 S.Ct. 1, 80 L.Ed. 47; Petroleum Exploration Co. v. Public Service Commission, 1938, 304 U.S. 209, 217, 58 S.Ct. 834, 82 L.Ed. 1294; Atlas Life Ins. Co. v. W. T. Southern Inc., 1939, 306 U.S. 563, 568-570, 59 S.Ct. 657, 83 L.Ed. 987.

Defendants urge as a further ground for dismissal that plaintiff has failed to exhaust the administrative remedy afforded by § 5 of the ordinance. Section 5 states that when, in the opinion of the Board of Supervisors, "the present or probable future agricultural, scenic, or historic value of the land involved does not justify such leveling or resoiling," the Board may, after application and public hearing, exempt such land from the requirements of the ordinance.

■ Obviously, if plaintiff's lands were to be exempted entirely, no injury to plaintiff could result from the ordinance. One who is not injured by the operation of a legislative enactment cannot be said to be deprived by it of either constitutional right or property. Cusack Co. v. Chicago, supra, 242 U.S. at page 530, 37 S.Ct. 190; Plymouth Coal Co. v. Commonwealth of Pennsylvania, supra, 232 U.S. at page 544, 34 S.Ct. 359; Lindsley v. Natural Carbonic Gas Co., supra, 220 U.S. at page 77, 31 S.Ct. 337.

In October, 1942, plaintiff ceased operations for the duration of the war pursuant to Order L-208 of the War Production Board. Upon repeal of this order July 15, 1945, plaintiff began preparations to resume dredging, but actual dredging has not commenced. Thus it does not appear that plaintiff will suffer undue injury if required to exhaust the possibility of entire exemption before proceeding further here. Lawrence v. St. Louis-San Francisco Ry. Co., 1927, 274 U.S. 588, 592, 47 S.Ct. 720, 71 L.Ed. 1219.

No constitutional right will be prejudiced by so doing. No emergency exists requiring instant action. And no serious financial loss will be incurred by the additional delay involved. St. Louis-San Francisco R. Co. v. Alabama Public Service Commission, 1929, 279 U.S. 560, 562, 563, 49 S.Ct. 383, 73 L.Ed. 893.

It is true of course that plaintiff is not here complaining of threatened unconstitutional application of a valid statute (cf. Porter v. Investors' Syndicate, 1932, 286 U.S. 461, 471, 52 S.Ct. 617, 76 L.Ed. 1226;

United States v. Illinois Central R. Co., 1934, 291 U.S. 457, 463, 54 S.Ct. 471, 78 L.Ed. 909), but attacks the validity of the ordinance as a whole. Euclid v. Ambler Co., supra, 272 U.S. at page 386, 47 S.Ct. 114; Smith v. Cahoon, 1931, 283 U.S. 553, 562, 51 S.Ct. 582, 75 L.Ed. 1264.

■ Sound judicial policy nevertheless dictates that the federal courts avoid constitutional adjudications involving state action "where not absolutely necessary." Chicago v. Fieldcrest Dairies, 1942, 316 U.S. 168, 173, 62 S.Ct. 986, 988, 86 L.Ed. 1355; Gilchrist v. Interborough Rapid Transit Co., 1929, 279 U.S. 159, 207, 49 S.Ct. 282, 73 L.Ed. 652.

As the Supreme Court observed in Railroad Commission v. Pullman Co., 1941, 312 U.S. 496, 500, 61 S.Ct. 643, 645, 85 L.Ed. 971: "Few public interests have a higher claim upon the discretion of a federal chancellor than the avoidance of needless friction with state policies * * *." Great Lakes Dredge & Dock Co. v. Huffman, 1943, 319 U.S. 293, 298, 63 S.Ct. 1070, 87 L.Ed. 1407.

These considerations of policy are "of special force when resort is had to the federal courts to restrain the action of state officers." Natural Gas Pipeline Co. v. Slattery, 1937, 302 U.S. 300, 311, 58 S.Ct. 199, 204, 82 L.Ed. 276. As was said in Beal v. Missouri Pac. R. Corp., 1941, 312 U.S. 45, 49, 50, 61 S.Ct. 418, 420, 85 L.Ed. 577:

"It is a familiar rule that courts of equity do not ordinarily restrain criminal prosecutions. * * * Hence interference with the processes of the criminal law in state courts, in whose control they are lodged by the Constitution, and the determination of questions of criminal liability under state law by federal courts of equity can be justified only in most exceptional circumstances, and upon clear showing that an injunction is necessary in order to prevent irreparable injury."

■ Unrecoverable expense of defending against actions to enforce an invalid legislative enactment is "not the sort of irreparable injury against which equity protects." Petroleum Exploration Co. v. Public Service Commission, 1938, 304 U.S. 209, 218-221, 58 S.Ct. 834, 840, 82 L.Ed. 1294.

Nor does the threat of fines alone for violation of an unconstitutional statute constitute a danger of such irreparable injury as to call for interference by a federal court of equity. Spielman Motor Sales Co. v. Dodge, 1935, 295 U.S. 89, 95, 96, 55 S.Ct. 678, 79 L.Ed. 1322; Beal v. Missouri Pac. R. Corp., supra, 312 U.S. at pages 50, 51, 61 S.Ct. 418.

To justify such interference, it must appear that plaintiff is threatened with "injury other than that incidental to every criminal proceeding brought lawfully and in good faith." Douglas v. City of Jeannette, 1943, 319 U.S. 157, 164, 63 S.Ct. 877, 881, 882, 87 L.Ed. 1324, 146 A.L.R. 81. Cf. Hague v. Committee for Industrial Organization, 1939, 307 U.S. 496, 502, 503, 59 S.Ct. 954, 83 L.Ed. 1423.

■ Section 11 of the ordinance provides a maximum punishment of $500 fine and six months imprisonment for each violation—"each day that any person fails to comply with this ordinance, or any provision therof * * *." The complaint here alleges that plaintiff and its agents are threatened with "a series of prosecutions" (Watson v. Buck, 1940, 313 U.S. 387, 400, 61 S.Ct. 962, 85 L.Ed. 1416. Cf. Williams v. Miller, 1942, 317 U.S. 599, 63 S.Ct. 258, 87 L.Ed. 489, affirming D.C., N.D.Cal., 1942, 48 F.Supp. 277), which defendants have not denied. Cf. Beal v. Missouri Pacific R. Corp., supra, 312 U.S. at pages 50, 51, 61 S.Ct. 418; Spielman Motor Sales Co. v. Dodge, supra, 295 U.S. at page 96, 55 S.Ct. 678.

This threat of numerous criminal actions (cf. Matthews v. Rodgers, 1932, 284 U.S. 521, 529, 530, 52 S.Ct. 217, 76 L.Ed. 447; Douglas v. City of Jeannette, supra, 319 U.S. at page 165, 63 S.Ct. 882), the consequent placing of plaintiff's agents in great risk of both fines and imprisonment if the ordinance be finally held valid (Ex parte Young, 1908, 209 U.S. 123, 163-165, 28 S.Ct. 441, 52 L.Ed. 714, 13 L.R.A.,N. S., 932, 14 Ann.Cas. 764; Terrace v. Thompson, supra, 263 U.S. at page 214, 44 S.Ct. 15) and the threatened damage to plaintiff's property rights for which there is no one who could be compelled to respond (Truax v. Raich, 1915, 239 U.S. 33, 37, 38, 36 S.Ct.

7, 60 L.Ed. 131, L.R.A.1916D, 545, Ann. Cas.1917B, 283; Dobbins v. Los Angeles, supra, 195 U.S. at page 241, 25 S.Ct. 18), combine to present a situation where the threat appears to be real and imminent and the injury threatened irreparable and substantial.

Moreover, as plaintiff points out, there is no provision in the ordinance for a stay of operation even pending hearing and determination of an application for exemption. Thus even if exemption ultimately be granted, plaintiff will have no adequate remedy for what will be lost before the Board acts. Oklahoma Natural Gas Co. v. Russell, 1923, 261 U.S. 290, 293, 43 S.Ct. 353, 67 L.Ed. 659.

"Rules of comity or convenience must give way to constitutional rights." Oklahoma Gas Co. v. Russell, supra, 261 U.S. at page 293, 43 S.Ct. at page 354, the case presented being one where a federal court of equity should intervene, it will not hesitate to do so. Meredith v. City of Winter Haven, 1943, 320 U.S. 228, 231, 234, 235, 64 S.Ct. 7, 88 L.Ed. 9.

Defendants' motion to dismiss must be determined on the facts alleged in the bill. Thus the affidavits and other evidence presented in support of and in opposition to plaintiff's application for a preliminary injunction may not be considered. Gibbs v. Buck, 1939, 307 U.S. 66, 76, 77, 59 S.Ct. 725, 83 L.Ed. 1111. It is always inexpedient to determine grave constitutional questions upon a motion to dismiss where, as here, "there is a reasonable likelihood that the production of evidence will make the answer to the questions clearer." Borden's Farm Products Co. v. Baldwin, supra, 293 U.S. at pages 211-213, 55 S.Ct. 187, 193; Polk Company v. Glover, 1938, 305 U.S. 5, 9, 10, 59 S.Ct. 15, 83 L.Ed. 6; Chastleton Corp. v. Sinclair, 1924, 264 U.S. 543, 547-549, 44 S.Ct. 405, 68 L.Ed. 841.

The problem at bar calls to mind the factors stated per curiam in Ohio Oil Co. v. Conway, 1928, 279 U.S. 813, 815, 49 S.Ct. 256, 73 L.Ed. 972:

"Where the questions presented by an application for an interlocutory injunction are grave, and the injury to the moving party will be certain and irreparable, if the application be denied and the final decree be in his favor, while if the injunction be granted the injury to the opposing party, even if the final decree be in his favor, will be inconsiderable, or may be adequately indemnified by a bond, the injunction usually will be granted."

A preliminary injunction restraining enforcement of Ordinance No. 253 is necessary to preserve the status quo pending an application for exemption under § 5 of the ordinance (St. Louis-San Francisco R. Co. v. Alabama Public Service Commission, supra, 279 U.S. at pages 562, 563, 49 S.Ct. 383; cf. Lawrence v. St. Louis-San Francisco Ry., supra, 274 U.S. 588, 47 S. Ct. 720) and pending hearing and determination of the suit. City of Hammond v. Schappi Bus Line, 1927, 275 U.S. 164, 172, 48 S.Ct. 66, 72 L.Ed. 218. Cf. Natural Gas Pipeline Co. v. Slattery, supra, 302 U.S. at pages 310, 311, 58 S.Ct. 199. A bond will fully indemnify defendants. Russell v. Farley, 1881, 105 U.S. 433, 441, 442, 26 L.Ed. 1060.

If, after hearing plaintiff's application for exemption, defendants grant it, or deny it in whole or in part and insist that plaintiff comply with the ordinance, further proceedings appropriate to the situation will then be had in this cause. St. Louis-San Francisco R. Co. v. Alabama Public Service Commission, supra, 279 U.S. at page 563, 49 S.Ct. 383; United States v. Illinois Central R. Co., supra, 291 U.S. at page 463, 54 S.Ct. 471.

Accordingly, defendants' motion to dismiss the bill is denied, plaintiff's application for a preliminary injunction is granted, and enforcement of Ordinance No. 253 as against plaintiff, or any one acting for plaintiff, will be enjoined until further order of the court. Such temporary injunction will not become effective unless and until plaintiff shall file with the Clerk a bond in the penal sum of $50,000, with good and sufficient surety, approved as provided by local rule 8, conditioned as required by Rule 65, Federal Rules Civil Procedure, 28 U.S.C.A. following section 723c, and with further provision for faithful performance by plaintiff of the resoiling required pursuant to Ordinance No. 253 of any land

dredged by plaintiff during the period of such temporary restraint and not exempted under § 5 of the ordinance, if the court should finally decide that plaintiff was not entitled to such preliminary injunction.

Findings and conclusions now made may of course be "rendered of no avail by the presentation of other or additional evidence when the case comes on for final hearing." City of Hammond v. Schappi Bus Line, supra, 275 U.S. at page 172, 48 S.Ct. at page 69.

Counsel for plaintiff will draft and submit for approval under local rule 7, within fifteen days, proposed interlocutory findings of fact and conclusions of law and proposed preliminary injunction, in keeping with Rules 52 and 65 Federal Rules Civil Procedure, and the views herein expressed.